STATE OF NORTH CAROLINA v. CARDELL SPAULDING

No. 10

(Filed 4 September 1979)

1. **Homicide § 28.1— first degree murder—evidence of self-defense—refusal to instruct error**

     The trial court in a first degree murder case erred in refusing to instruct the jury on self-defense where defendant, who was an inmate in Central Prison, offered evidence tending to show that (1) he did not provoke the affray where his only comments to the victim, another prison inmate, were that he wanted no trouble with him and did not want to hurt him; (2) defendant was not the aggressor, as the victim came toward defendant with his hand "jammed" into his pocket, and defendant backed up several steps to a fence in the

recreational yard of the prison before pulling out his knife and stabbing the victim; and (3) though the victim had no weapon on his body when he was removed from the crime scene by prison guards, and never actually made a show of deadly force toward defendant, defendant nevertheless offered evidence of apparent necessity to kill in self-defense where he testified that the victim had threatened him, he feared that the victim meant to stab him, and the victim backed him up to a fence, all the while having his hand "jammed" into his pocket.

**2. Homicide § 19— first degree murder in prison — self-defense — prior attack on defendant — evidence improperly excluded**

In a prosecution of defendant, a prison inmate, for the first degree murder of another prison inmate, the fact that defendant, while in prison, had previously been the subject of a violent, near-fatal attack was clearly relevant and material to the jury's determination of the issue of the reasonableness of defendant's response to the victim's alleged threats and behavior, and the trial court erred in excluding evidence concerning the earlier attack.

**3. Homicide § 19— first degree murder in prison — self-defense claimed — availability of knives — evidence improperly excluded**

In a prosecution of defendant for the first degree murder of a fellow prison inmate where defendant claimed that he stabbed his victim in self-defense, the trial court erred in refusing to permit defendant to offer evidence concerning the availability of knives to the inmates in his prison block in order to assist in establishing his claim of self-defense and to rebut the State's evidence as to security precautions taken to assure that inmates in defendant's block did not have access to weapons.

**4. Homicide § 19— first degree murder — self-defense — knowledge that men were dangerous — evidence improperly excluded**

In a prosecution of defendant for the first degree stabbing of a fellow prison inmate where both inmates were confined to the block housing the most incorrigible and dangerous prisoners, the trial court erred in excluding testimony by defendant that he knew that anyone assigned to his block of the prison would be a dangerous man and that this knowledge was one of the reasons he took a knife out to the recreational yard, since such evidence was relevant to defendant's claim of self-defense.

**5. Homicide § 19— first degree murder — self-defense — pervasiveness of fear of physical harm — evidence improperly excluded**

In a prosecution of defendant for the first degree murder of a fellow prison inmate where both inmates were confined to the block housing the most incorrigible and dangerous prisoners, the trial court erred in excluding testimony by defendant, other inmates and a former Commissioner of Corrections as to the pervasiveness of fear of physical harm on the part of inmates in that block, since that evidence was admissible with respect to defendant's claim of self-defense to assist the jury in determining whether defendant reacted to the situation as a person of "ordinary firmness" would have.

6. **Homicide § 19— first degree murder—self-defense—evidence properly excluded**

In a prosecution of defendant for the first degree murder of a fellow prison inmate, the trial court did not err in excluding: (1) the opinion of a social anthropologist that the circumstances defendant encountered in prison could have produced in a person of ordinary firmness an apprehension of death or great bodily harm, since the jury could determine the reasonableness of defendant's apprehension as well as the anthropologist; (2) testimony concerning hostility between guards and prisoners on the block which housed defendant, since such evidence did not show that the guards would fail to come to the aid of an inmate being attacked; and (3) evidence of the allegedly dehumanizing conditions under which defendant lived, since there was no logical connection between this evidence and the issue of defendant's right to kill in self-defense.

7. **Criminal Law § 135.3; Jury § 7.11— bifurcated trial—one jury—jurors opposed to capital punishment**

There was no merit to the contention of defendant in a first degree murder case that he was entitled to have separate juries empaneled to hear the issues of guilt and punishment and that a prospective juror could not be excluded from the guilt determination phase because of his views on capital punishment.

Justice CARLTON did not participate in the consideration or decision of this case.

BEFORE *Judge Albright* at the 19 June 1978 Criminal Session of WAKE Superior Court and on a bill of indictment proper in form, defendant was tried and convicted of first degree murder. He was sentenced to death in a separate proceeding as required by G.S. 15A-2000. He appeals pursuant to G.S. 7A-27(a).

*Rufus L. Edmisten, Attorney General, by J. Michael Carpenter and Donald W. Stephens, Assistant Attorneys General,* for the state.

*Wade M. Smith and Roger W. Smith, Attorneys for defendant appellant.*

EXUM, Justice.

I

Defendant is charged with the murder of Hal Roscoe Simmons. At trial he admitted killing Simmons but offered evidence tending to show he did so out of fear because Simmons had threatened him and was advancing on him at the time of the killing. The trial court refused to instruct the jury on self-defense.

We hold this was prejudicial error and order that defendant receive a new trial. We also discuss the admissibility of certain evidence offered by defendant relating to the issue of self-defense and defendant's assignment of error concerning the exclusion of prospective jurors for cause because of their attitudes on capital punishment.

At the time of the killing, both defendant and Simmons were inmates in Central Prison, quartered on J Block. J Block and the adjoining I Block are the most heavily secured sections in Central Prison. Inmates in these two blocks are not allowed contact with any other inmates in the prison. Their only contact with each other is for a period of one hour a day when they are given the option of going to a fenced-in area outside for recreation. The inmates are allowed out at this recreation period in small groups of not more than seven to nine men. They must undergo a strip search before they go out to the yard.

There are 46 prisoners housed in I and J Blocks. According to the testimony of Mr. Kenneth E. Garner, a Correctional Officer at Central Prison,

"All prisoners who are on I & J Block have had problems within the prison system. They are people who have been put into the North Carolina Prison System and thereafter had some kind of trouble. They either had problems with the inmate population or the staff. Basically speaking, the people in I Block and J Block are the toughest or most incorrigible prisoners in the North Carolina Prison System."

The state's evidence showed that Simmons was transferred from I Block to J Block on 8 February 1978. On 9 February he did not leave his cell for the recreational period; on 10 February, at about 9:30 a.m., he did. Some minutes thereafter defendant also left his cell to go onto the yard.

The procedure which is followed by an inmate on I or J Blocks who wishes to go outside was described as follows: The inmate removes all his clothing except for his underwear and his shoes and hands it to a guard. The clothes are then searched. The inmate is handcuffed and walked to a security cage. He is placed in the cage, and it is locked. His handcuffs are removed. He then takes off the rest of his clothing, and his body cavities and hair

are examined to ensure he has no weapons. He is given back his clothing and allowed to dress, after which a mechanical door to the security cage is opened so he can go outside.

Both Simmons and defendant went through this process. According to the state's evidence, as the door to the outside was being opened for defendant, he positioned himself so that it could not be closed. He then reached back and took a homemade knife that was handed him by Benny Linder, the inmate whose cell was next to the security cage. After receiving the knife, defendant stepped out into the yard, approached Simmons and stabbed him several times. Simmons ran up the stairs to I Block where he collapsed. Defendant laid the knife on a ledge and returned to J Block. Simmons died shortly after the stabbing. The cause of his death was a wound to the neck.

Defendant testified in his own behalf. He stated that he had been placed on J Block on 20 August 1977 after he had been stabbed by other prisoners on 26 June 1977. He did not not know Hal Roscoe Simmons prior to 10 February 1978. On the morning of that day he heard someone yell out his name. He responded and the person yelling identified himself as Simmons. The following conversation then ensued:

"He [Simmons] said, well, he asked me what floor, I told him I was in J-3-6 down there, and he said, well, well, don't want you to get in my face at no time; said going on the yard, don't want nothing to do with you on account I left from I Block over there and my friends have been talking about you, I don't want you in my face.

"I told him, I said, well, I didn't want no trouble with him, hadn't been having any trouble with the guys on the floor I had been recreating with them all of the time. And he still—he said, go on the yard, hit the yard, I got something for you. I told him again I didn't want any trouble, you know, if I could avoid it."

Defendant testified that as a result of this conversation he feared that Simmons meant to stab him when they went out to the yard. He wanted to "talk it over" with Simmons but as a precaution he placed a knife which he had fashioned from a broken light fixture in the lining of his shoe. He then went out for

recreation. According to defendant, the officer who searched his shoe did not find the knife.

Defendant stated that after he got outside he took the knife out of his shoe and put it in his pocket. As he came up to the other inmates, Simmons began advancing toward him with his hand "jammed" in his pocket. Defendant told Simmons he didn't want any trouble and didn't want to hurt him. Simmons said nothing and continued to advance. Defendant then took out his knife and stabbed Simmons.

Testimony of several inmates corroborated defendant's version of the events, both as to the conversation and the incident in. the yard. Benny Linder denied having handed defendant the knife with which Simmons was killed. Several inmates said they heard Simmons threaten defendant. Each of the inmates who were in the recreation area at the time of the killing testified that Simmons was advancing toward defendant with his hand in his pocket.

## II

[1]   The principal question presented on this appeal is whether the trial court erred in refusing to instruct the jury on self-defense. "In resolving this question the facts are to be interpreted in the light most favorable to defendant." *State v. Watkins*, 283 N.C. 504, 509, 196 S.E. 2d 750, 754 (1973).

"A person may kill in self-defense if he be free from fault in bringing on the difficulty and it is necessary, or appears to him to be necessary to kill so as to save himself from death or great bodily harm." *State v. Davis*, 289 N.C. 500, 509, 223 S.E. 2d 296, 302, *death penalty vacated*, 429 U.S. 809 (1976). To be entitled to an instruction on self-defense, then, defendant had to present evidence tending to show (1) he was free from fault in the matter, and (2) it was necessary, or reasonably appeared to be necessary, to kill in order to protect himself from death or great bodily harm.

"The requirement that a defendant must be free from fault in bringing on the difficulty before he can have the benefit of self-defense ordinarily means that he himself must not have precipitated the fight by assaulting the decedent or by inciting in him the reaction which caused the homicide." *State v. Jennings*, 276

State v. Spaulding

N.C. 157, 163, 171 S.E. 2d 447, 451 (1970). When the evidence here is interpreted in the light most favorable to defendant, this requirement is satisfied. Defendant's only comments to Simmons were that he wanted no trouble with him and did not want to hurt him. This is not language tending to incite an affray. Defendant's evidence is that he was not the aggressor in the affray. Simmons was coming toward defendant with his hand "jammed" into his pocket. Defendant had made no show of force. He told Simmons he wanted no trouble. Simmons said nothing and continued advancing. According to other inmates, defendant backed up several steps to a fence in the yard before pulling out his knife and stabbing Simmons. All of this evidence tends to show Simmons was the aggressor. In going out into the yard, defendant was going to a place where he had a right to be. *See State v. Guss*, 254 N.C. 349, 118 S.E. 2d 906 (1961). In arming himself as a precaution, in the context of this case, defendant was not at fault vis-a-vis the law of homicide so long as he did not use the knife or threaten decedent with it until it became necessary or apparently necessary to do so in self-defense.

The state relies on *State v. Watkins, supra,* 283 N.C. 504, 196 S.E. 2d 750, and *State v. Brooks,* 37 N.C. App. 206, 245 S.E. 2d 564 (1978), to support its contention that an instruction on self-defense was inappropriate. Both these cases are factually distinguishable. Defendant in *Watkins* sought out the deceased and approached to within five or six feet of him brandishing a shotgun. Deceased lunged at defendant and defendant shot him. Defendant in *Brooks* was an inmate in Caledonia Prison. He testified that he had an argument with another prisoner, James T. Williams, and that shortly afterwards he saw Williams get a knife and put it in his pocket. Williams then went to the bathroom area of the prison dormitory to take a shower. Defendant followed Williams to the shower area and waited for him. When Williams emerged and confronted defendant, he reached toward his pocket; defendant then pulled his own knife from his pocket and stabbed Williams.

In both *Watkins* and *Brooks* the defendants aggressively sought out their victims. In each case, the defendant's actions were of such a nature as to provoke the affray. Viewing the evidence in the light most favorable to defendant, such is not the case here. Defendant went out to the yard, a place where he had

a right to be. He did not seek Simmons out for the purpose of a violent encounter. He neither did nor said anything to provoke Simmons. Instead, he repeatedly told Simmons he wanted no trouble. According to evidence presented by defendant, he was free from fault in the difficulty.

Defendant was thus entitled to an instruction on self-defense if there is any evidence in the record that it was necessary, or reasonably appeared to be necessary, to kill in order to protect himself from death or great bodily harm. *See State v. Johnson,* 166 N.C. 392, 81 S.E. 941 (1914). There was no evidence presented that Simmons was armed at the time of the stabbing; indeed, the guards who removed him from the yard testified they found no weapon on his person. Defendant cannot under these facts claim a right to kill in self-defense based on actual necessity; to the extent that right was available to him, it arose from apparent necessity.

The concept of apparent necessity was explained as follows by then Chief Justice Bobbitt in *State v. Gladden,* 279 N.C. 566, 572, 184 S.E. 2d 249, 253 (1971):

"[T]he right of self-defense rests upon necessity, real or apparent; and, in the exercise of his lawful right of self-defense, a person may use such force as is necessary or apparently necessary to protect him from death or great bodily harm. (Citation omitted.) In this connection, the full significance of the phrase 'apparently necessary' is that *a person may kill even though to kill is not actually necessary to avoid death or great bodily harm, if he believes it to be necessary and has a reasonable ground for that belief. The reasonableness of his belief is to be determined by the jury from the facts and circumstances as they appeared to him at the time of the killing.*" (Emphasis supplied.)

Defendant here offered evidence that Simmons threatened him and that because of the threats he thought Simmons meant to stab him. There was testimony that when the two of them went out into the yard Simmons advanced on defendant with his hand in his pocket; that defendant told Simmons he did not want trouble; that Simmons said nothing and continued to advance; and that defendant stabbed Simmons only after he had backed up to the fence in the yard.

Simmons never actually made a show of deadly force toward defendant. It is this fact on which the trial court primarily relied in refusing to instruct on self-defense. Such a show of force is not, however, necessary under these circumstances. It is sufficient that defendant have a reasonable apprehension that an assault on him with deadly force is imminent. *See State v. Goode*, 249 N.C. 632, 107 S.E. 2d 70 (1959); *State v. Ellerbe*, 223 N.C. 770, 28 S.E. 2d 519 (1944). As this Court said in *State v. Barrett*, 132 N.C. 1005, 1008, 43 S.E. 832, 833 (1903):

> "If [a defendant's] adversary does anything which is calculated to excite in his mind, while in the exercise of ordinary firmness, a reasonable apprehension that he is about to assail him and to take his life or to inflict great bodily harm, it would seem that the law should permit him to act in obedience to the natural impulse of self-preservation and to defend himself against what he supposes to be a threatened attack, even though it may turn out afterwards that he was mistaken; provided, always, as we have said, the jury find that his apprehension was a reasonable one and that he acted with ordinary firmness."

This Court has, moreover, held that an action by the victim as if to reach for a weapon was sufficient to justify an instruction on self-defense. *State v. Finch*, 177 N.C. 599, 99 S.E. 409 (1919); *State v. Johnson, supra*, 166 N.C. 392, 81 S.E. 941. Defendant claims it was his belief, as a result of the threats and the behavior to which he testified, that he was in imminent danger of great bodily harm or death. Under the evidence he presented, the reasonableness of this belief was a question for the jury. It was prejudicial error for the trial court to refuse an instruction on self-defense, and for that error defendant is entitled to a new trial.

### III

Defendant has brought forward under some thirteen assignments of error over two hundred exceptions to rulings of the trial court excluding evidence defendant sought to introduce on the issue of self-defense. We discuss these rulings generally for guidance of the trial court on remand.

The principal issue to which all this evidence is directed is the reasonableness of defendant's fear that he was in danger of

death or great bodily harm. Generally speaking, "a jury should, as far as is possible, be placed in defendant's situation and possess the same knowledge of danger and the same necessity for action, in order to decide if defendant acted under reasonable apprehension of danger to his person or his life." *State v. Johnson*, 270 N.C. 215, 219, 154 S.E. 2d 48, 52 (1967). This is in line with our general rule in criminal cases that "every circumstance that is calculated to throw any light upon the supposed crime is admissible." *State v. Hamilton*, 264 N.C. 277, 286-87, 141 S.E. 2d 506, 513 (1965), *cert. denied*, 384 U.S. 1020 (1966). Nevertheless, "such facts and circumstances as raise only a conjecture or suspicion ought not to be allowed to distract the attention of [the jury] from material matters." *Pettiford v. Mayo*, 117 N.C. 27, 29, 23 S.E. 252, 253 (1895). With these rules in mind, we examine the excluded evidence.

[2] Defendant offered through Dr. Alfred Hamilton and Kelly Sparks, another inmate, testimony concerning the stabbing of defendant while he was a prison inmate on 26 June 1977. Dr. Hamilton would have testified to the nature of defendant's wounds, which apparently could have been fatal had he not received prompt medical attention. Sparks, who was also stabbed and seriously injured at the same time, would have testified about the incident. This testimony should be admitted, assuming it is otherwise properly presented and kept within reasonable bounds. The reasonableness of defendant's response to Simmons' alleged threats and behavior is the primary factor for the jury to weigh in determining whether he had a right to kill in self-defense. *See State v. Gladden, supra*, 279 N.C. 566, 184 S.E. 2d 249. The fact that defendant as a prison inmate had previously been the subject of a violent, near-fatal attack is clearly relevant and material to the jury's determination of this issue.

[3] Defendant also offered extensive evidence relating to the availability of knives to the inmates on J Block. This evidence included testimony (1) that most inmates had knives or similar weapons, (2) that knives could be fashioned from materials in the inmates' cells, (3) that there were weapons hidden in the recreation yard, and (4) that it was possible to smuggle weapons past the guards into the recreation yard. Defendant here was privileged to use deadly force in self-defense only if he had a reasonable apprehension of an imminent assault upon him with

deadly force. *See State v. Clay*, 297 N.C. 555, 256 S.E. 2d 176 (1979); *State v. Goode, supra*, 249 N.C. 632, 107 S.E. 2d 70. Under the circumstances of this case, this apprehension could have arisen only if he had a reasonable belief that Simmons was armed. The state offered extensive testimony as to security precautions taken to assure that inmates in J Block did not have access to weapons. Defendant should be permitted to present to the jury his evidence of the availability of weapons both to rebut the state's evidence and to assist in establishing his claim of self-defense.

[4] Defendant sought to testify that although he did not know Simmons prior to 10 February 1978, he knew that anyone assigned to I and J Blocks would be a dangerous man. He also would have testified, if permitted, that this knowledge was one of the reasons he took a knife out to the yard with him. Defendant argues for the admissibility of this evidence with an apt quotation from *State v. Floyd*, 51 N.C. 392, 398 (1859); "One cannot be expected to encounter a lion as he would a lamb." We agree; if properly presented, such testimony should be admitted. There was evidence in the record from the state's witnesses that the inmates in I and J Blocks were the most dangerous and incorrigible in Central Prison. Defendant's awareness of this fact is a relevant factor for the jury to consider.

[5] Defendant offered testimony through himself, other inmates and Lee Bounds, former Commissioner of Corrections, as to the pervasiveness of fear of physical harm on the part of inmates in I and J Blocks. To the extent this evidence tends to show then current conditions on I and J Blocks and defendant's awareness of them, it is admissible. The jury on the issue of self-defense must decide whether defendant reacted to the situation as a person of "ordinary firmness" would have. *State v. Barrett, supra*, 132 N.C. 1005, 43 S.E. 832. Evidence that defendant lived in a climate of constant fear, and that those around him experienced a similar state of fear, is relevant and material in applying the standard of "ordinary firmness" under the circumstances. Testimony by defendant and other inmates to this effect is competent and should be admitted. Testimony by Mr. Bounds, a man with extensive experience with regard to North Carolina's prisons, is likewise admissible to the extent it reflects his personal knowledge of the conditions of I and J Blocks prevailing at the

time of this incident. To the extent, however, that his testimony relates to the prior organization and the former objectives of I and J Blocks, it does not have a sufficient logical connection to the issues in this case to be admitted.

[6] Defendant also attempted to introduce the opinion of Dr. Collin Turnbull, a social anthropologist who had done studies on southern prisons, that the circumstances defendant encountered could have produced in a person of ordinary firmness an apprehension of death or great bodily harm. The trial court acted properly in excluding this opinion. In determining if the opinion of an expert witness is admissible, the key question is whether "the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact." *State v. Wilkerson*, 295 N.C. 559, 569, 247 S.E. 2d 905, 911 (1978). Here, the jury, after hearing and weighing all the evidence, would be in as good a position as Dr. Turnbull to determine the reasonableness of defendant's apprehension. His opinion on this issue is, therefore, inadmissible.

Defendant offered to show through a number of witnesses the hostility that existed between guards and prisoners on I and J Blocks. Defendant argues this evidence is admissible to show that the guards would not have come to the aid of an inmate being attacked. We do not agree. Even if we assume that such hostility does exist it supports no more than a conjecture that the prison guards would so neglect their duty as to fail to stop a fight between prisoners. Evidence, therefore, of general hostility between guards and inmates is inadmissible.

Lastly, defendant attempted to show particular aspects of the dehumanizing conditions under which he lived. Defendant has failed to demonstrate any logical connection between this evidence and the issue of defendant's right to kill in self-defense. This evidence is not independently admissible, although we note that much of it necessarily came before the jury in connection with the admission of other relevant evidence.

IV

[7] Defendant also assigns as error the trial court's exclusion from the jury of eleven prospective jurors who indicated they would not vote for the death penalty under any circumstances.

Defendant concedes that the jurors could properly have been excluded from the punishment phase of the trial under *Witherspoon v. Illinois*, 391 U.S. 510 (1968). He argues, however, that he is entitled to have separate juries empaneled to hear the issues of guilt and punishment and that a prospective juror cannot be excluded from the guilt determination phase because of his views on capital punishment. This argument was raised and rejected in *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979). There, Chief Justice Branch, speaking for the Court, said, *id.* at 105-06, 257 S.E. 2d at 563-64:

> "Defendant's position in this regard is that a bifurcated trial pursuant to Article 100 of Chapter 15A should be abolished and the two phases of the trial should be heard by two separate and distinct juries. We do not agree. The United States Supreme Court has approved the bifurcated trial procedure in which the same jurors heard both phases of the trial. *Gregg v. Georgia*, 428 U.S. 153, 49 L.Ed. 2d 859, 96 S.Ct. 2909 (1976); *Jurek v. Texas*, 428 U.S. 262, 49 L.Ed. 2d 929, 96 S.Ct. 2950 (1976). Further, in *Witherspoon* the Court expressly noted that there was no error in exclusion for cause of jurors who made it clear that their attitudes toward the death penalty would prevent them from making an impartial decision as to defendant's *guilt*.

> "Under Article 100 of Chapter 15A of the General Statutes of North Carolina, it is contemplated that the same jury shall hear both phases of the trial unless the original jury is 'unable to reconvene.' G.S. 15A-2000(2). We are, therefore, of the opinion that the trial judge acted pursuant to the mandate of the statute and within the rationale of *Witherspoon*." (Emphasis original.)

This assignment of error is without merit.

We need not comment on defendant's other assignments of error for they may not arise on remand. For the reasons stated, defendant is entitled to a

New trial.

Justice CARLTON did not participate in the consideration or decision of this case.