STATE OF NORTH CAROLINA v. BENJAMIN ROMAN WILLIAMS

No. 285A95

(Filed 8 March 1996)

**Homicide § 380 (NCI4th)— murder trial—self-defense instruction not required**

A defendant on trial for first-degree murder was not entitled to an instruction on self-defense because defendant could not have subjectively believed it necessary to kill the victim in order to save himself from death or great bodily harm, and no such belief could have been objectively reasonable, where defendant testified that he fired his pistol three times into the air to scare a

STATE v. WILLIAMS

[342 N.C. 869 (1996)]

group from Tarboro and make them retreat so he could leave the area during a second confrontation between a friend of defendant and the Tarboro group, that he did not know anyone had been shot until the next day, and that he never intended to shoot anyone; defendant himself was neither directly nor indirectly threatened by anyone during either of the two confrontations with the Tarboro group; and the victim was shot in the back while attempting to run from the scene. Defendant's contention that his possession of a pistol was a result of his fear from the shooting and leg amputation of his brother two weeks earlier and his belief that his brother's assailant might be after him was irrelevant where defendant's brother was shot in a different town, and there was no evidence that anyone from Tarboro was involved in the shooting of his brother.

**Am Jur 2d, Homicide §§ 480, 498, 499, 514, 519-521.**

**Standard for determination of reasonableness of criminal defendant's belief, for purposes of self-defense claim, that physical force is necessary—modern cases. 73 ALR4th 993.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Brown (Frank R.), J., at the 12 December 1994 Criminal Session of Superior Court, Edgecombe County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 16 February 1996.

*Michael F. Easley, Attorney General, by James Peeler Smith, Special Deputy Attorney General, for the State.*

*T. Perry Jenkins for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 31 May 1994 for the first-degree murder of Kenneth L. Freeman. The defendant was tried noncapitally, and the jury found the defendant guilty of first-degree murder on the theory of premeditation and deliberation. By judgment and commitment dated 13 December 1994, Judge Brown sentenced defendant to a term of life imprisonment.

The State's evidence tended to show that in April 1994, the defendant lived in Rocky Mount, North Carolina, with his mother, his

## STATE v. WILLIAMS

[342 N.C. 869 (1996)]

two brothers and his sister. One of defendant's brothers was in the hospital because he had been shot and his leg had been amputated. On 17 April 1994, defendant went to Tarboro, North Carolina, with a group of friends. Among those who went to Tarboro with the defendant were Barry Williams, Derrick Whitaker, Derrick Anderson and Jock Hargrove. The defendant had recently bought a pistol because he had heard that the person who shot his brother "was going to get him next." Defendant testified that unknown to him, Hargrove brought the pistol with him to Tarboro.

Shortly after the group arrived in Tarboro, Colon Booker, a local Tarboro man, and Whitaker began to argue. Booker flagged down a car in which William Staton, Donald Parker and the victim were riding. Booker told Staton that the group from Rocky Mount was going to jump him. Defendant testified that Booker then pulled up his shirt and reached for a pistol. One of the men in the car said, "shoot the one," which is street talk for a one-on-one, hand-to-hand fight. Defendant then testified that he told Booker that they had "no beef" with Booker. Defendant and his friends then left the area and drove to the home of Whitaker's uncle, Larry Foster.

Whitaker went into Foster's house while the others remained in the car. Whitaker told his uncle that Colon Booker had given him some trouble and that he wanted to go back and fight. Foster suggested that they go together and try to resolve the problem peacefully. Foster, Whitaker and the rest of the group from Rocky Mount returned to the scene of the altercation with Booker. When they returned, Whitaker again indicated that he wanted to fight. The defendant and the others got out of their cars. Whitaker approached William Staton, one of the men from Tarboro, as if ready to fight. Donald Parker and the victim then joined Staton to help defend him.

Parker testified that at this point the defendant, who was standing in front of defendant's car, drew a pistol from the waist of his pants and pointed it directly at Staton and said, "Brace yourself." The defendant fired the pistol as Parker, Staton and the victim tried to run away. Three shots were fired. The third shot struck the victim, causing him to fall. The victim got up and continued to run until collapsing a short distance later. Police arrived at the scene and called the rescue squad. The victim died in the ambulance on the way to the hospital. No weapon was found in the victim's possession.

Foster testified that he was standing near the defendant when the defendant fired the weapon. Foster stated that the defendant fired

toward the middle of the intersection where Staton, Parker and the victim were standing. Foster further testified that no one was bothering the defendant in any manner.

Dr. Lewis Levy, a pathologist at Nash General Hospital, performed an autopsy on the victim. The autopsy revealed that the victim died from a gunshot wound which caused him to bleed to death. The bullet entered the right side of the victim's back and travelled to the left front of his body, crossing the chest through the lungs and heart. The lack of residue around the wound indicated that the pistol was not fired at close range.

The defendant testified that during the first altercation, Booker pulled up his shirt and reached for a pistol, and that he heard one of the Tarboro men say, "shoot the one." Defendant stated that they then left the scene. When the defendant and his friends returned to the scene, Whitaker went over to Parker and asked why they wanted "to jump him." Staton then came over and asked several times, "What's up?" The defendant testified that he felt threatened because Staton reached at his belt as if he were reaching for a pistol. Defendant testified that he then pointed his pistol in the air and fired three shots to scare Staton and the others and make them back off. Defendant did not think anyone was hit by the shots. Defendant also indicated that Hargrove brought the pistol to Tarboro and that he took the pistol from Hargrove only after hearing someone say "shoot the one," because he believed weapons were about to be "pulled" on him and his friends. Other defense witnesses testified that the Tarboro men were "digging in their pants" as if they were going to pull out pistols.

In his sole assignment of error, the defendant contends that the trial court erred by refusing to instruct the jury on the theory of self-defense. The defendant specifically argues that the trial court erred because the evidence, when viewed in the light most favorable to him, clearly showed that his possession of a pistol was the result of his fear of bodily harm in view of the shooting and leg amputation of his brother two weeks earlier, and in view of the first altercation with the men from Tarboro in which defendant saw a pistol and heard someone say "shoot the one." Based on this evidence, defendant argues that the jury could have found it reasonable for the defendant to believe that deadly force was necessary to save himself and his friends.

It is well settled that perfect self-defense excuses a killing when at the time of the killing:

(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Maynor*, 331 N.C. 695, 699, 417 S.E.2d 453, 455 (1992) (quoting *State v. Bush*, 307 N.C. 152, 158, 297 S.E.2d 563, 568 (1982)).

In the case *sub judice*, the defendant did not testify that he fired his weapon at the victim because he believed that deadly force was necessary to save himself from death or great bodily harm. Instead, the defendant testified that he fired his pistol three times into the air to scare Staton and the others and make them retreat so he could leave the area. The defendant further testified that he did not know anyone had been shot until the next day and maintains that he never actually intended to shoot anyone. The defendant is not entitled to an instruction on self-defense while still insisting that he did not fire the pistol at anyone, that he did not intend to shoot anyone and that he did not know anyone had been shot. Clearly, a reasonable person believing that the use of deadly force was necessary to save his or her life would have pointed the pistol at the perceived threat and fired at the perceived threat. The defendant's own testimony, therefore, disproves the first element of self-defense.

Furthermore, even if the defendant believed that deadly force was needed, such belief was not objectively reasonable as required by the second element of perfect self-defense. The facts show that the defendant himself was neither directly nor indirectly threatened by anyone during either of the two confrontations between Whitaker and the group from Tarboro. When the defendant shot the victim, the defendant was standing in front of his car, some distance from the altercation. Defendant testified that he saw Staton reach for his belt as if reaching for a pistol. However, defendant also testified that he

STATE v. WILLIAMS

[342 N.C. 869 (1996)]

never actually saw Staton with a pistol. Other than the defendant's self-serving claim that he thought Staton was reaching for a weapon, the evidence shows only that Staton approached the scene and inquired, "What's up?" repetitively. The record is totally void of any evidence showing that Staton had a pistol or threatened defendant in any manner. There is also no evidence that the victim ever had a weapon or made any threatening gesture toward the defendant.

Finally, the evidence shows that the defendant fired three shots. After the first shot was fired, the victim turned and began to run away. The victim was struck, in the back, by the third shot. The fact that the victim was shot in the back while attempting to run from the scene is significant. It is entirely unreasonable to believe that a person of ordinary firmness would have considered the use of deadly force necessary to protect himself or herself from an unarmed person who was running from the scene. The defendant's fear, resulting from his brother's shooting and from the belief that the assailant might be after him, is irrelevant. The defendant's brother was shot in Rocky Mount, not Tarboro. There is no evidence whatsoever that anyone from Tarboro was involved in the shooting of the defendant's brother. Even assuming the defendant's fear was real, it did not justify a preemptive strike against an unarmed individual. Thus, the second element of perfect self-defense is not reflected in the evidence.

In light of the defendant's own testimony, it is apparent he could not have subjectively believed it necessary to kill the victim in order to save himself from death or great bodily harm. Nor could any such belief have been objectively reasonable. We, therefore, find it unnecessary to discuss the last two elements of perfect self-defense, although we note in passing that the evidence shows that defendant was the aggressor in the affray and that he used excessive force. We thus hold defendant's argument to be without merit and overrule this assignment of error.

For the foregoing reasons, we conclude that the defendant received a fair trial, free of prejudicial error.

NO ERROR.