MURPHY, Judge.
 

 *803
 
 Rashand Nicholas Fitts ("Defendant") was convicted of felony murder, the underlying felony being discharging a firearm into an occupied vehicle. On appeal, he contends the trial court improperly refused to instruct the jury on self-defense despite there being evidence from which a jury could reasonably conclude that he acted in perfect self-defense. After careful review, we conclude the trial court did not err in declining to instruct on self-defense.
 

 Background
 

 On 24 May 2014, Defendant rode with his cousin, Archie Huff ("Huff"), in Huff's Tahoe SUV ("Tahoe") to a nearby service station. Huff went into the convenience store, leaving his handgun in a holster on the console, while Defendant waited in the Tahoe. When Huff attempted to make a purchase, he realized he had left his wallet at home. Defendant and Huff then left to retrieve the wallet.
 

 *804
 
 While Defendant and Huff were gone, Travis Rhodes ("Rhodes"), Donte Alston ("Alston"), Devonte Tillery ("Tillery"), and Telvin arrived at the service station to sell liquid Phencyclidine ("PCP") in the service station's parking lot. Alston and Telvin rode in Alston's Chrysler sedan, while Rhodes and Tillery arrived in a black Mustang. The four were sitting together in Alston's sedan, socializing and smoking PCP, when Defendant and Huff returned to the service station.
 

 Huff again entered the store, while Defendant remained outside. Rhodes and Tillery got out of Alston's sedan and approached Defendant. Defendant rolled down the window and Rhodes offered to sell him "high grade marijuana." Defendant responded that he already had some marijuana, but asked to see Rhodes' selection and said he would take Rhodes' cell phone number in case he needed to buy from Rhodes in the future.
 

 Rhodes and Tillery returned to the Mustang with Rhodes in the driver's seat and Tillery in the passenger seat. Defendant exited the Tahoe with Huff's gun in his back pocket, and walked over to the Mustang. Defendant took Huff's gun with him because Huff asked Defendant not to leave it on the console if he left the car. Defendant looked at Rhodes' marijuana and told Rhodes that when Huff came out of the store he would use Huff's phone to get Rhodes' phone number. In response, Rhodes complained: "Man ... you doing all this like you want to buy some weed, and you don't want to buy no weed," then drove off.
 

 Defendant found Rhodes' behavior strange and returned to the Tahoe. Huff returned from the store and noticed Defendant appeared "concerned," but did not inquire further. Huff pulled out of the service station,
 
 *656
 
 driving north on Capital Boulevard toward the Starmount shopping center intersection. The north-bound side of the intersection has three lanes running straight through it and one left-turn lane. As Defendant and Huff approached the light, the Mustang stopped in the second straight lane from the left. Huff pulled into the leftmost lane at Defendant's direction and the Tahoe stopped parallel to the Mustang.
 

 The events at the stoplight are disputed by Defendant and the State. For purposes of our inquiry, Defendant maintains as follows. As the Tahoe pulled alongside the Mustang, Defendant heard Rhodes shout: "what's up with y'all niggers? What you think, this is a game?" Rhodes then demanded Tillery "pass [him] the motherfucking gun." Tillery reached towards the back seat with both hands, while Rhodes left one hand on the steering wheel and reached into the back seat with his other hand.
 

 *805
 
 Observing Rhodes and Tillery, Defendant "was scared" and "thought they [were] going to shoot in the [Tahoe.]" In response, Defendant grabbed Huff's gun from the console and opened the Tahoe's passenger door. He stepped out of the Tahoe, started to move away from the Mustang, then reached across his body to fire once at Rhodes, as he looked in the opposite direction. Defendant explained that he fired the gun "so [Rhodes would not] shoot me or Archie." Defendant returned to the Tahoe, and Huff drove away, through the intersection.
 

 The bullet hit Rhodes in the torso, causing him to crash the Mustang into another car before jumping the median and striking a sign on the far side of the southbound lane. Tillery exited the Mustang. An off-duty police officer saw the crash, radioed dispatch, and approached the car to investigate. He found Rhodes unconscious. When on-duty law enforcement officers arrived and searched the Mustang, they found three cell phones and three grams of marijuana. No weapons, shell casings, or bullet holes were found in the Mustang. Law enforcement did, however, find a single spent shell casing on the street.
 

 Defendant was charged with first-degree murder based on premeditation and deliberation and first-degree felony murder based on discharging a firearm into an occupied vehicle. Months before trial, Defendant filed a Motion of Intent to Rely Upon Self-Defense and Defense of Others. On the last day of trial, he filed a written request for jury instructions, requesting an instruction on self-defense based on Defendant and Huff's testimony of the events that took place at the intersection. The trial court denied this request and did not instruct on self-defense.
 

 On the second day of its deliberation, the jury asked the trial court: "Is 'just cause' a component for our consideration in the first-degree felony murder rule." Defendant requested that the trial court respond by instructing the jury that "just cause" applies to felony murder, but the trial court refused. Instead, the trial court instructed the jury that "just cause is not a term used in the court's instruction" and that they were bound to follow the instructions provided by the trial court.
 

 Defendant was convicted of first-degree felony murder and sentenced to life in prison without the possibility of parole. He gave notice of appeal in open court.
 

 Analysis
 

 On appeal, Defendant argues he was entitled to a jury instruction on self-defense and that the trial court's failure to so instruct was
 
 *806
 
 prejudicial error. He contends that a reasonable jury could find the shooting constituted perfect self-defense based on the testimony given at trial. We disagree.
 
 [1]
 

 We review a trial court's jury instructions de novo.
 
 State v. Osorio
 
 ,
 
 196 N.C.App. 458
 
 , 466,
 
 675 S.E.2d 144
 
 , 149 (2009) (citations omitted). "It is the duty of the [trial] court to charge the jury on all substantial features of the case arising on the evidence without special request.... [All] defenses presented by defendant's evidence are
 
 *657
 
 substantial features of the case."
 
 State v. Dooley
 
 ,
 
 285 N.C. 158
 
 , 163,
 
 203 S.E.2d 815
 
 , 818 (1974) (citations omitted).
 

 Perfect self-defense is a complete defense to felony murder if it would be a complete defense to the underlying felony.
 
 State v. Richardson
 
 ,
 
 341 N.C. 658
 
 , 668,
 
 462 S.E.2d 492
 
 , 499 (1995). It exists when, at the time of the homicide: (1) the defendant believes he is in imminent danger of death or serious bodily injury; (2) that belief is reasonable; (3) the defendant is not the aggressor in the dispute or altercation creating the threat; and (4) the defendant's use of force is not more than is reasonably necessary to protect himself or another person from death or serious bodily harm.
 
 State v. Revels
 
 ,
 
 195 N.C.App. 546
 
 , 550,
 
 673 S.E.2d 677
 
 , 681 (2009). Merely reaching or appearing to reach for a deadly weapon is sufficient to satisfy elements (1) and (2).
 
 State v. Spaulding
 
 ,
 
 298 N.C. 149
 
 , 157,
 
 257 S.E.2d 391
 
 , 396 (1979). If appropriate, perfect self-defense would provide a complete defense to the underlying offense here, discharging a firearm into an occupied vehicle.
 
 State v. Juarez
 
 , --- N.C. ----, ----,
 
 794 S.E.2d 293
 
 , 298 (2016).
 

 However, testimony by a defendant that he attempted to use or threaten non-lethal force is evidence that he did not believe that deadly force was necessary to escape danger.
 
 State v. Lyons
 
 ,
 
 340 N.C. 646
 
 , 662,
 
 459 S.E.2d 770
 
 , 778 (1995) (finding that no self-defense instruction was required for a defendant who claimed that he intended to fire a warning shot at people entering his home who he thought were burglars but were in fact police officers). Instead, " '[p]erfect self-defense' is available only if 'it appeared to defendant that he believed it to be necessary to kill the attacker in order to save himself from death or great bodily harm[.]' "
 

 *807
 

 State v. Cook
 
 , --- N.C.App. ----, ----, --- S.E.2d ----, ----,
 
 2017 WL 2644848
 
 , at *2, 2017 N.C.App. LEXIS 454 (2017) (holding that a defendant was not entitled to a self-defense instruction when he testified that he did not have the intent to kill when he fired through a closed door at an unidentified person breaking into his bedroom) (quoting
 
 State v. Williams
 
 ,
 
 342 N.C. 869
 
 , 872,
 
 467 S.E.2d 392
 
 , 394 (1996) ) (emphasis omitted).
 

 Under our case law, as recently and exhaustively considered in
 
 Cook
 
 , the use of a firearm that a defendant describes as something other than an aimed, deliberate attempt to kill the victim cannot support a finding of perfect self-defense, and a defendant's testimony that he did not shoot to kill will prevent the jury from hearing a self-defense instruction "even if there is, in fact, other evidence from which a jury could have determined that the defendant did intend to kill the attacker."
 
 Cook
 
 , --- N.C.App. ----, --- S.E.2d ----,
 
 2017 WL 2644848
 
 , at *2, 2017 N.C.App. LEXIS 454 (emphasis omitted). This results in Defendants who are on trial for firing poorly aimed warning shots being unable to receive jury instructions on self-defense.
 
 See
 

 Williams
 
 ,
 
 342 N.C. at 873-74
 
 ,
 
 467 S.E.2d at 394-95
 
 (finding no error where the defendant testified that he fired into the air to scare off his alleged attackers and did not receive a self-defense instruction);
 
 State v. Reid
 
 ,
 
 335 N.C. 647
 
 , 671-72,
 
 440 S.E.2d 776
 
 , 789-90 (1994) (upholding conviction and failure to provide self-defense instruction when the defendant claimed that he shot at the ground near the victim without ever intending to hit him);
 
 State v. Hinnant
 
 ,
 
 238 N.C.App. 493
 
 , 495-97,
 
 768 S.E.2d 317
 
 , 319-20 (2014) (finding a defendant's testimony that the victim reached for a gun and the defendant intended to fire a warning shot did not require a self-defense instruction).
 

 A trial court must provide a perfect self-defense instruction to the jury if the evidence presented tends to show all four elements of perfect self-defense existed at the time of the killing.
 
 State v. Gappins
 
 ,
 
 320 N.C. 64
 
 , 70-71,
 
 357 S.E.2d 654
 
 , 659 (1987). To determine whether there was evidence of self-defense, we construe evidence in the light most favorable to the defendant.
 
 State v. Webster
 
 ,
 
 324 N.C. 385
 
 , 391,
 
 378 S.E.2d 748
 
 , 752 (1989) (citation omitted).
 

 Viewing the facts before us in the light most favorable to Defendant, the first three elements of self-defense were present when he shot Rhodes: (1) Defendant testified he believed Rhodes and Tillery were about to shoot him or Huff; (2) a reasonable person could conclude from the evidence that
 
 *658
 
 Rhodes and Tillery were reaching for guns to shoot Defendant or Huff; and (3) until the moment Defendant fired at Rhodes, Defendant had not attacked or threatened Rhodes in any way.
 
 *808
 
 Defendant's own testimony, however, indicates that he did not shoot to kill. In his direct examination, he did not specify what he was aiming at or what his intent was when he fired. He simply testified that he "[pulled] the gun out [of] the holster and fire[d] one time," in order to ensure that "[Rhodes] wouldn't shoot me or Archie." Defendant described the event in more detail during his cross examination:
 

 [THE STATE]: How about this, what direction were you facing when you fired the gun?
 

 [DEFENDANT]: I was facing the rear of the truck. I was trying to flee.
 

 [THE STATE]: Okay. And so would that put the Mustang to your side?
 

 [DEFENDANT]: Well, the Mustang would be to my left now-
 

 [THE STATE] Okay.
 

 [DEFENDANT]: [W]hen I fired the shot.
 

 [THE STATE]: Did you fire over your shoulder?
 

 [DEFENDANT]: No, ma'am, like this.
 

 [THE STATE]: Are you right handed or left handed?
 

 [DEFENDANT]: Right handed.
 

 [THE STATE]: So where was the gun?
 

 THE COURT: You can stand up and demonstrate.
 

 [DEFENDANT]: If I'm sitting in the truck like this, and I open the door trying to run this way, that would leave the Mustang right here. I pulled the gun out of the holster, I fired one time.
 

 [THE STATE]: Okay. So, basically, you're not you're facing away?
 

 [DEFENDANT]: Yes, ma'am.
 

 Defendant makes clear he was not looking at the car when he fired, and he had to reach across his body to fire the gun behind him while running in the opposite direction. Like the defendant in
 
 Cook
 
 , who testified that he fired through a closed door at someone that he could not see, Defendant's testimony as to the circumstances in which he shot Rhodes
 
 *809
 
 demonstrates that he did not intend for his use of force to kill the victim. Such an intent is required for a trial court to instruct a jury on perfect self-defense. Significantly, had Defendant testified that he shot Rhodes with the intent to kill, he would have been entitled to a self-defense instruction. This may not be "what most citizens would believe our law to be and what I believe self-defense law
 
 should be
 
 in our state[,]"
 
 Cook
 
 , --- N.C.App. ----, --- S.E.2d ----,
 
 2017 WL 2644848
 
 , at *3, 2017 N.C.App. LEXIS 454 (Murphy, J., concurring) (emphasis in original); nevertheless, we are bound by precedent to rule that Defendant was not entitled to an instruction on self-defense.
 

 Conclusion
 

 Defendant's own testimony makes clear that he did not have the intent to kill and was not entitled to an instruction on self-defense. We find no error and affirm Defendant's conviction.
 

 AFFIRMED.
 

 Judges CALABRIA and DIETZ concur.
 

 [1]
 

 Defendant further argues the trial court "compounded" the purported error by its response to the jury's question on the second day of its deliberations. However, as we do not find error with the trial court declining to instruct on self-defense, we do not address whether such an error was "compounded" by the trial court's response to the jury's question.