Justice EARLS dissenting.
Tobias Toler was thirty-six years old when he was stabbed in the heart on 11 August 2015 and died moments later in Sharpsburg, North Carolina. His blood alcohol content at *486 the time of his death was 0.34 and a pocketknife was found on his person. Defendant Alphonzo Harvey admitted stabbing Mr. Toler, and the only question for the jury in this case was whether the killing was justified. I dissent because I believe the trial court and this Court are making the judgment call that should be made by the jury, the twelve men and women of Edgecombe County who heard the evidence and saw the witnesses testify at trial. In so doing, the Court ignores controlling precedent and applies inconsistent standards to weigh the evidence.
This Court recently reaffirmed long-standing doctrine that:
"The jury charge is one of the most critical parts of a criminal trial." State v. Walston , 367 N.C. 721, 730, 766 S.E.2d 312, 318 (2014). "[W]here competent evidence of self-defense is presented at trial, the defendant is entitled to an instruction on this defense, as it is a substantial and essential feature of the case ...." State v. Morgan , 315 N.C. 626, 643, 340 S.E.2d 84, 95 (1986) (citations and emphasis omitted); see State v. Guss , 254 N.C. 349, 351, 118 S.E.2d 906, 907 (1961) (per curiam) ("The jury must not only consider the case in accordance with the State's theory but also in accordance with defendant's explanation.").
State v. Lee , 370 N.C. 671, 674, 811 S.E.2d 563, 565-66 (2018) (alterations in original).
**312 To determine whether Mr. Harvey was entitled to an instruction on self-defense, the evidence must be viewed in the light most favorable to him. State v. Moore , 363 N.C. 793, 796, 688 S.E.2d 447, 449 (2010). "An affirmative defense is one in which the defendant says, 'I did the act charged in the indictment, but I should not be found guilty of the crime charged because * * *.' " State v. Caddell , 287 N.C. 266, 289, 215 S.E.2d 348, 363 (1975) (citations omitted). Defendant here admitted to killing the victim; the trial judge was required to consider the evidence in the light most favorable to defendant and to ignore any inconsistent evidence in deciding whether to submit the requested self-defense or imperfect self-defense instructions. It was then the jury's job to determine defendant's guilt or innocence. By refusing to instruct the jury on self-defense when evidence supporting the instruction was present, the judge usurped the role of the jury and all but guaranteed a guilty verdict.
Rather than consider the evidence in the light most favorable to defendant, the Court here imposes a "magic words" requirement in favor of the State. In essence, the majority holds that by failing to testify using the magic words, "I was in fear of my life and believed I needed to kill Toby to save myself from death or great bodily harm," the defendant has failed to allege self-defense and, equally damning, by using the magic word "accident" in passing during his testimony to refer to the incident, defendant has foreclosed any consideration by the jury of whether he acted in self-defense. Our case law imposes no such magic word requirement or trap for defendants. Instead, the trial court must consider the defendant's evidence as true, including other testimony and evidence received at trial which tends to support it, and disregard any contradictory evidence when determining whether the jury should be instructed on self-defense. Moore , 363 N.C. at 796-98, 688 S.E.2d at 449-50.
The majority recounts some of defendant's evidence concerning self-defense and then finds it "unpersuasive." The question for the Court is not whether the evidence is persuasive, but whether it establishes the elements of self-defense or imperfect self-defense. With regard to the first two elements of self-defense, whether it appeared to defendant that it was necessary to kill Toler in order to protect himself from death or great bodily harm and whether that belief was reasonable, the evidence is as follows: Alphonzo Harvey repeatedly asked Toby Toler to leave his house after Toler had been drinking, was argumentative, and used foul language in front of Harvey and his female guests. Toler was "staggering all over my [Harvey's] house" and Harvey asked him seven or eight times to leave. Toler refused to do so.
**313 Finally, Harvey walked out and Toler followed him. Toler then "said he ought to whip my [Harvey's] damn ass." Other witnesses described how Toler said to Harvey, "I will fuck you up." Toler threw a bottle of beer at *487 Harvey.[1] Toler also threw a brick at Harvey, which Harvey testified hit his finger when he raised his hand. Witnesses said the brick hit the wall of Harvey's house with a loud thud. Toler hit Harvey; Harvey hit him back, and Toler knocked over Harvey's scooter, breaking the headlights.
Toler then pulled out a pocketknife and threatened Harvey with it: according to Harvey, "He told me he ought to kill my damn ass with it." Harvey testified that at this point, "I thought he was going to try and hurt me so." When asked why, Harvey responded, "Because he had a pocketknife." Harvey testified that he then went back into his trailer and got a knife that was mounted on the end of a wooden rod "because I was scared he [Toler] was going to try and hurt me." Harvey explained that he was just holding his knife in his hand:
Q. Were you just holding it or were you -
A. I didn't do nothing. Just holding it in my hand. I didn't do nothing.
Q. At any point did you go and use your knife to physically remove him?
A. No, he came up on me, coming up on me. He was walking up on me with his knife. That's when I had my knife.
....
Q. And at what point did you hit him with your knife?
A. I didn't, I just hit - he -
THE COURT: Did what?
....
A. I said hit him right there.
Q. After you hit him right there with it, what did he do?
A. He ran to the road.
**314 Later Harvey explained that, after returning the knife to his trailer, he left the scene because "I was scared somebody might come up and try to hurt me." Taken in the light most favorable to the State, Harvey left the scene and went to a neighbor's house because he knew he had done something wrong. Taken in the light most favorable to defendant, Harvey left because he truly was afraid of Toler, and his contemporaneous action confirms that his testimony that he was scared is not simply a self-serving fabrication after the fact.
Harvey further testified that he was scared and uncertain as to what Toler would do to him, partly because he knew Toler to carry a knife at all times. "[E]vidence of prior violent acts by the victim or of the victim's reputation for violence may, under certain circumstances, be admissible to prove that a defendant had a reasonable apprehension of fear of the victim." State v. Strickland , 346 N.C. 443, 459, 488 S.E.2d 194, 203 (1997) (citation omitted), cert denied , 522 U.S. 1078, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998) ; see also State v. Irabor , --- N.C. App. ----, ----, 822 S.E.2d 421, 424 (2018) ("Defendant's knowledge of [the victim]'s violent propensities, being armed , and prior acts supports the trial court's finding that defendant reasonably believed it was necessary to use deadly force to save himself from death or great bodily harm." (emphasis added)). Based on defendant's testimony and all the circumstances, the evidence was "sufficient that defendant ha[d] a reasonable apprehension that an assault on him with deadly force [wa]s imminent." State v. Spaulding , 298 N.C. 149, 157, 257 S.E.2d 391, 396 (1979) (citations omitted).
On some key points, the majority ignores Harvey's testimony and credits contradictory testimony. For example, on the question of whether Toler was approaching Harvey with his knife in his hand when Harvey stabbed him, or whether Harvey approached Toler, the majority assumes the facts most favorable to the State. Despite Harvey's repeated testimony that he was scared of Toler, was afraid he would be hurt, and was being threatened with a knife by Toler, who was drunk and had just said he ought to kill him, the majority finds that the evidence "fails to manifest any circumstances existing at the time defendant stabbed Toler which would have justified an instruction on either perfect or imperfect self-defense." This is contrary to our precedents presenting very similar facts in which this Court has held that a self-defense *488 or imperfect self-defense instruction is required.
For example, in Spaulding the defendant stabbed and killed another inmate who was advancing on him with his hand in his pocket, and this Court found it was error to refuse to instruct the jury on self-defense. 298 N.C. at 156-57, 257 S.E.2d at 396. In that case the reasonableness of **315 the defendant's belief that he was in imminent danger of great bodily harm or death "was a question for the jury." Id. at 157, 257 S.E.2d at 396. Similarly, in State v. Webster the defendant shot and killed an unarmed man who previously had been in the defendant's trailer, was asked to leave, and had left. 324 N.C. 385, 389, 378 S.E.2d 748, 751 (1989). Sometime later, the victim returned and was standing on the steps of the trailer when the defendant shot him. Id. at 389, 378 S.E.2d at 751. The defendant testified: "I was afraid in my condition. I could not fight him and that was the only thing I could do." Id. at 389, 378 S.E.2d at 751, 324 N.C. 385. That was sufficient evidence to submit a self-defense instruction to the jury, and the trial court's refusal to allow the defendant in that case to state whether he believed his life was threatened was reversible error. Id. at 393, 378 S.E.2d at 753. In relevant portions, the facts in Spaulding and Webster are similar to the facts in this case, and defendant here is entitled to a self-defense instruction, as were those defendants.
Even more relevant is State v. Buck , in which the Court instructed that "we reiterate that it is important for the trial court to include the possible verdict of not guilty by reason of self-defense in its final mandate to the jury." 310 N.C. 602, 607, 313 S.E.2d 550, 553 (1984). There the defendant's account of the incident was that the victim had an open pocketknife in his hand and came into the kitchen where the defendant was standing. Id. at 603, 313 S.E.2d at 551. The victim acted abusively and threatened to kill a third person. Id. at 603, 313 S.E.2d at 551. When the victim went towards the defendant while brandishing the open pocketknife, the defendant, hoping to scare the victim, grabbed a butcher knife and the two men struggled and fell to the floor, causing the butcher knife to lodge in the victim's chest. Id. at 603, 313 S.E.2d at 551. The defendant pulled the butcher knife out and tossed it aside, and the two kept fighting for a period of time until the victim dropped the pocketknife, got up, and walked out of the apartment. Id. at 603-04, 313 S.E.2d at 551-52. The victim died later that day. Id. at 604, 313 S.E.2d at 552. In that case the Court had no difficulty observing that, based on the defendant's evidence, "[i]f, however, the jury should conclude that he intentionally wielded the knife, then it should acquit him on the grounds of self-defense." Id. at 606, 313 S.E.2d at 553. There is nothing about the material facts of Buck to distinguish it from this case.
Part of the majority's concern here appears to be that Harvey did not say, "I was afraid for my life and believed I had to kill my attacker ." But, as the transcript reveals, defendant was inarticulate. Defendant testified he only completed the ninth or tenth grade. In addition to his limited education, defendant had sustained a severe head injury in a **316 car accident in 2008, which required insertion of a metal plate in his head. As a result of the head injury, defendant was permanently disabled and suffered memory loss. The injury also affected defendant's ability to talk and function. Inarticulate and less well coached defendants should be treated equally with those who can easily learn the "magic words" the majority would require for a self-defense instruction. The question is whether there is evidence of self-defense or imperfect self-defense, when taken in the light most favorable to defendant. See State v. Dooley , 285 N.C. 158, 163, 203 S.E.2d 815, 818 (1974) ("Where there is evidence that defendant acted in self-defense, the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in defendant's evidence." (citations omitted))
The cases cited by the majority for the proposition that when the defendant claims the killing is accidental, or that a weapon was used solely to get the victim and others to retreat, do not apply here because Harvey clearly stated that he feared Toler was trying to hurt him and that he used his knife when Toler "came up on" him with a pocketknife. Specifically, *489 State v. Williams , 342 N.C. 869, 467 S.E.2d 392 (1996), involved a defendant who testified that he fired his weapon in the air to scare those who made him feel threatened and did not shoot at anyone; State v. Lyons , 340 N.C. 646, 459 S.E.2d 770 (1995), involved a defendant who testified that he fired a warning shot at the top of his door because he believed he was being robbed and that he was not trying to hit anyone; and State v. Blankenship , 320 N.C. 152, 357 S.E.2d 357 (1987), involved a defendant who testified that during a physical fight, he pulled out his gun to hit the victim on the head with it, after which the victim grabbed the gun by the barrel and it fired accidently. Each of these circumstances is very different from Mr. Harvey's situation, in which he testified that while he was standing on the steps of his trailer, Toler came at him with a knife and he stabbed Toler in the chest. Harvey acknowledged in his testimony that he struck the blow intentionally. The context of his later statement regarding Toler's "accident" shows that he was using the same word to refer to the incident that a previous witness had used. Annie May Alston, testifying before Harvey, stated: "Not on that particular day that the accident happened, no." Harvey then testified: "After the accident happened to him, he left." His use of the word "accident" does not directly refer to his own actions and does not negate all his other testimony regarding his fears about how Toler intended to harm him. To imply otherwise is to elevate form over substance in a manner that is unjustified by the evidence in this case. **317 Second-degree murder does not require that the accused acted with the intent to kill, and therefore, Harvey did not need to testify that he intended to kill Toler, only that he intended to strike the blow, as this Court explained in State v. Richardson , 341 N.C. 585, 461 S.E.2d 724 (1995). See State v. Carter , 357 N.C. 345, 361, 584 S.E.2d 792, 803-04 (2003) (reaffirming Richardson ), cert denied , 541 U.S. 943, 124 S.Ct. 1670, 158 L.Ed.2d 368 (2004) ; see also Lee , 370 N.C. at 673, 811 S.E.2d at 565 (self-defense available as a defense to second-degree murder). Moreover, Toler already had threatened to kill Harvey, had hit him, and he had thrown both a bottle and a brick at him. Harvey did not need to wait for Toler to actually stab him with the pocketknife before defending himself.
Harvey may have used excessive force to repel Toler's attack, in which case the jury should have had the option of finding that Harvey acted in imperfect self-defense. See State v. Bush , 307 N.C. 152, 159, 297 S.E.2d 563, 568 (1982) (imperfect self-defense exists when the defendant believed it necessary to kill his adversary in order to save himself and when that belief was reasonable, but the defendant was either the aggressor or used excessive force), habeas corpus granted sub nom. Bush v. Stephenson , 669 F. Supp. 1322 (E.D.N.C. 1986), aff'd per curiam , 826 F.2d 1059 (4th Cir. 1987) (unpublished). But the jury did not have that opportunity here because the trial court erroneously failed to give a self-defense instruction. The jury, not the trial judge or this Court, has the responsibility to weigh the evidence and determine whether Alphonzo Harvey acted in self-defense, either perfectly or imperfectly, when he stabbed Tobias Toler. Accordingly, I would remand for a new trial.

The majority describes this as a plastic beer bottle, but only one witness of several who testified to this actually said that it was plastic; other testimony indicated the bottle was glass.