State v. Blankenship

STATE OF NORTH CAROLINA v. WILLIAM HARVEY BLANKENSHIP

No. 552PA86

(Filed 7 July 1987)

**Homicide § 28.2— failure to instruct on self-defense—no error**

The Court of Appeals improperly awarded a new trial in a homicide prosecution based on the trial court's failure to charge the jury on self-defense where defendant's evidence tended to show that the shooting was an accident; there was no evidence to show that defendant in fact formed a belief that it was necessary to kill the victim to protect himself; and the trial court gave proper instructions concerning the defense of accident.

Justices WEBB and WHICHARD did not participate in the consideration or decision of this case.

ON discretionary review of a decision of the Court of Appeals, 82 N.C. App. 285, 346 S.E. 2d 171 (1986), vacating judgment entered by *Barefoot, J.,* at the 12 August 1985 Session of Superior Court, BEAUFORT County, and awarding the defendant a new trial.

The defendant was indicted for first degree murder. A jury found him guilty of second degree murder. He was sentenced to imprisonment for a term of forty years. The Court of Appeals awarded the defendant a new trial. The State's petition for discretionary review was allowed by the Supreme Court on 6 January 1987. Heard in the Supreme Court on 13 May 1987.

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Assistant Attorney General, for the State, appellant.*

*Wayland J. Sermons, Jr. for the defendant appellee.*

MITCHELL, Justice.

The defendant contended in the Court of Appeals that the trial court had committed reversible error by failing to instruct the jury on a theory of self-defense. The Court of Appeals agreed and awarded the defendant a new trial. We reverse the decision of the Court of Appeals.

The State's evidence tended to show that on 22 November 1984, Joy Wright invited Betty Jean Dixon to her apartment in Washington, North Carolina (the original city of that name in this

country) for Thanksgiving dinner. Wright had been living with her boyfriend, the victim Charles S. Foster, for two months. Dixon brought the defendant, William Harvey Blankenship, and her brother with her. Wright had never met the defendant before.

After they drank two six-packs of beer, Wright said that her boyfriend got mean when he was drinking and liked to fight. She thought he might be drinking that day and might not like the two men and the two women being together in the apartment. If he said anything, Wright told them all, the two men would have to leave.

The defendant gave Betty Jean Dixon $20.00 with which to buy more beer. Joy Wright accompanied her to the store. On their way out of the apartment, they met the victim Foster. Wright told him about her visitors. The victim said, "I don't like [the defendant]. He sent a lot of my friends to prison at Morehead, and I don't want to be around him." Wright told Foster that he was the man of the house and should ask the defendant Blankenship to leave if he did not want him there. As the two women returned from the store, the defendant ran across the yard toward them. Wright told the defendant that he should leave if the victim had said anything to him.

The defendant Blankenship returned to his mother's house where his girlfriend, Martha Harrison, also lived. He slammed the living room door with such force that a picture fell off the wall. He said a man had called him a "narc" and that he was going to kill the man. The defendant changed into his "ass kicking outfit" which included a knife. Around 6:00 p.m., the defendant gave a friend $60.00 for a .38 caliber pistol. He test-fired it on the way to Wright's apartment. He gave his knife to Harrison to hold.

Meanwhile, various other guests arrived at Wright's for dinner. Around 6:30 p.m., the defendant came in Wright's back door demanding, "Who called me a narc?" The victim walked toward the defendant saying, "I told you that I didn't want you in here." The defendant shot the victim from three to four feet away and threatened to "blow the brains out" of the others in the living room if they moved. The defendant later returned the gun to his friend, saying he no longer wanted it, and got his money back.

The defendant testified that when the victim had entered the apartment earlier that afternoon, the defendant had tried to be

friendly to him. The victim called him "a snitch from Morehead" and asked if the defendant wanted to fight. The defendant left Wright's apartment and went home. He and his girlfriend then drove around, trying to find someone to aid him in getting his change from the $20.00 he had given Betty Jean Dixon. One friend refused to go with him, but gave him a .38 caliber pistol to use for protection from the victim. When they went to Wright's, the defendant told Harrison that she should go inside if a man answered the door, because the defendant did not want to fight. If a woman answered the door, the defendant would go inside. When the defendant knocked, a woman said, "Come in." The defendant entered while Harrison stayed on the doorstep.

The defendant testified that when he entered, the victim said, "I didn't like your looks the first time you were here. Now I'm going to kick your ass good." The victim grabbed the defendant by the neck and slammed him against the door. The defendant hit him, but the victim would not let go. The defendant's feet were not touching the floor. He pulled out his gun to hit the victim on the head with it, but the victim grabbed it by the barrel and said, "Give it here." The victim jerked and twisted the gun. It fired, wounding him in the stomach. He died around 4:00 a.m. The defendant further testified: "[I]t never occurred to me to shoot . . . . If it hadn't went off when it did, . . . I don't know whether I would have shot or not, but he had hold of the gun, so I couldn't get it up to hit him with it."

The trial court did not charge the jury on a theory of self-defense, despite the defendant's request. The Court of Appeals concluded that this was reversible error and awarded the defendant a new trial.

The State contends that the trial court properly refused to instruct the jury on a theory of self-defense, because no evidence tended to show that the defendant *in fact* formed a belief that it was necessary to kill the victim to protect himself from death or great bodily harm. We agree.

Even in the light most favorable to the defendant, the evidence tended to show only that he intended to repel the victim with non-deadly force and was equivocal about whether he would have ever formed an intention to shoot, reasonable or not. Even if at some later point he had formed an intent to shoot, it does not

follow necessarily that he would have intended to shoot to kill. *See State v. Berry*, 35 N.C. App. 128, 240 S.E. 2d 633, *cert. denied*, 294 N.C. 737, 244 S.E. 2d 155 (1978) (no self-defense instruction warranted where defendant holding gun by side and victim struck it causing it to discharge). Where, as in the present case, "there is no evidence from which the jury reasonably could find that the defendant *in fact* believed that it was necessary to kill his adversary to protect himself from death or great bodily harm, the defendant is not entitled to have the jury instructed on self-defense." *State v. Bush*, 307 N.C. 152, 160, 297 S.E. 2d 563, 569 (1982) (emphasis added). Therefore, the trial court was correct in refusing to instruct the jury on either perfect or imperfect self-defense. *Id.*

In sum, the defendant's evidence tended to show that the shooting was an accident. The trial court gave proper instructions to the jury concerning the defense of accident. The evidence did not warrant more.

We hold that the Court of Appeals improperly awarded the defendant a new trial on this issue. The decision of the Court of Appeals is reversed, and this case is remanded to it for its consideration of the defendant's remaining assignments of error.

Reversed and remanded.

Justices WEBB and WHICHARD did not participate in the consideration or decision of this case.