STATE OF NORTH CAROLINA v. JIMMY LEE WEBSTER

No. 416A88

(Filed 4 May 1989)

**Homicide § 19— whether defendant felt his life was threatened—question excluded —error**

> The trial court erred in a prosecution for first degree murder by sustaining the district attorney's objection to a question as to whether defendant believed that his life was threatened because that evidence was highly relevant to the crucial question of defendant's state of mind at the time of the shooting, his knowledge and belief of danger, and his knowledge and belief of the necessity of action in relation to his plea of self-defense.

APPEAL by defendant from a judgment sentencing him to life imprisonment for murder in the first degree, imposed by *Saunders, J.*, at the 7 March 1988 Criminal Session of Superior Court, RUTHERFORD County. Heard in the Supreme Court 15 February 1989.

. *Lacy H. Thornburg, Attorney General, by Reginald L. Watkins, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant.*

FRYE, Justice.

In this non-capital first degree murder case, defendant was originally charged and arrested on 26 July 1987 for the voluntary manslaughter of Cornelius Lee Jeffries (also known as Bert Jeffries). On that same day an attorney was appointed for defendant. The manslaughter charge was dismissed on 5 August 1987 for lack of probable cause. At the probable cause hearing, defendant was represented by his appointed attorney, James H. Burwell, Jr., who spent approximately five hours on the case.

Two months later, on 5 October 1987, the Rutherford County Grand Jury returned an indictment charging defendant with the murder of Jeffries. On 17 February 1988, the prosecutor served defendant with notice of the return of the bill of indictment and an order for arrest. On that same day James H. Burwell, Jr., was again appointed to represent defendant. When the murder case was called for trial on 7 March 1988, defendant's attorney made

an oral motion to continue. Mr. Burwell represented to the court that he was not ready for trial and that he needed to obtain the testimony of Dr. Fred F. Adams, III, defendant's physician. The motion was denied and the case proceeded to trial. All of the evidence was presented that day. On the following day the jury returned a verdict of guilty of murder in the first degree and defendant was sentenced to life imprisonment.

On direct appeal to this Court, pursuant to N.C.G.S. § 7A-27(a), defendant contends that the trial court "erroneously and unconstitutionally" denied his motion to continue; that the trial court erroneously excluded evidence that was relevant to defendant's state of mind in relation to his plea of self-defense; and that the trial court committed plain error in failing to instruct the jury on defendant's right to defend his home. For the reasons stated in this opinion, we hold that the trial court erred by sustaining the State's objection to the question of whether defendant felt that his life was threatened, thus erroneously excluding evidence that was relevant to defendant's state of mind in relation to his plea of self-defense.

The evidence at trial showed that defendant was forty-six years old and was at all material times in extremely poor health with several serious medical conditions. The evidence also showed that defendant, the victim, and the victim's mother all lived in the same neighborhood in Rutherford County.

Calvin Woods testified for the State that defendant had been in the hospital for seven days in late July 1987, had gotten out of the hospital on 24 July, and was in poor health on 26 July 1987. Defendant was so weak that his mother asked Woods to stay with defendant and take care of him. Woods moved into defendant's mobile home and was caring for defendant, "running around and getting his medicine and stuff." On 26 July a group of people, including Jeffries, gathered at defendant's mobile home to socialize and to welcome defendant home from the hospital. While at the mobile home, Jeffries got into an argument with defendant. Defendant retreated toward his bedroom and Jeffries followed. Woods' brother pleaded that Woods "had better stop it." Woods interceded, got Jeffries by the arm and led him into the front yard. Defendant came to the front door with a shotgun and told Jeffries "to git [sic] on out of his yard away from his house."

Woods then "took [Jeffries] on to the road." Jeffries came back down the road and said that he was coming back in defendant's yard. Woods testified that he told Jeffries not to go onto defendant's property, but that Jeffries "come on anyway." Woods finally convinced Jeffries to leave the neighborhood and drove Jeffries and some others away. Jeffries then had a few drinks. Some time later, the group drove back to defendant's neighborhood, Woods got out of the car, and Jeffries "went on."

Jeffries' mother testified that she heard about the argument and went to defendant's mobile home at about 3 p.m. on 26 July. Defendant was there with some friends, but Jeffries was not with them. Defendant asked Mrs. Jeffries to keep her son away from his mobile home. Defendant first said "I'll kill the m—— f——," but then promised Mrs. Jeffries that he would try to resolve the argument peacefully.

Stanley Woods testified that he was listening to music on a stereo at defendant's mobile home on the afternoon of 26 July. Defendant was weak and sick, was sitting outside, and was being welcomed back from the hospital by friends. Jeffries then came up the road from his mother's house in a "fast pacey walk." Upon seeing Jeffries, defendant went into his mobile home. Jeffries entered defendant's yard and proceeded up the steps leading to the front door of the mobile home. Defendant twice said "don't come in my house m—— f——." Woods then "heard a shot and started running."

Randy Whitesides testified that he was greeting defendant and listening to music outside of defendant's mobile home at about 5:30 p.m. on 26 July. Defendant was sick and weak and on a dialysis machine. Defendant entered his mobile home. Jeffries went "up the steps of the trailer and was standing at the door" when he was shot. Defendant said "m—— f——, didn't I say not to come in my trailer?" and Jeffries said "Jimmy." Whitesides testified that he did not see a gun, but that he then saw fire, heard a shot, and saw Jeffries roll down the steps of defendant's mobile home. Defendant then came outside carrying a shotgun.

Deputy Sheriff Paul Dunn testified that he arrived at defendant's mobile home at approximately 5:30 p.m. on 26 July, that he saw Jeffries "lying with his feet up the concrete steps and his head on the ground," and that defendant voluntarily surrendered.

Emergency Medical Technician Gerald Tony testified that "Mr. Jeffries was on his back and his feet in the doorway of the trailer." Sheriff Detective Clarence Simmons testified that Jeffries was lying on his back and that "[t]he edge[s] of [his] heels were resting on the door frame itself." Simmons testified that defendant made the following statement while in custody: "I'm sorry I had to kill him but I had already run him off one time. I told him if he came back I was going to kill him. I've been in the hospital, I've been sick and I want no m——— f——— coming around my house bothering me." Simmons acknowledged that defendant was quite weak.

Dr. Michael Wheeler testified that he performed an autopsy on Jeffries on 27 July, that he found a gunshot entrance wound in the back left part of Jeffries' neck, that the shotgun barrel "was fired within inches to feet of" Jeffries, that it was a "close range" wound and that Jeffries died from the wound. Wheeler testified that Jeffries was clinically intoxicated at the time of death and had a blood alcohol level equivalent to .20 on the breathalyzer.

The parties stipulated that a letter from defendant's doctor, Fred F. Adams, III, of Shelby Medical Associates, could be read into evidence. Defendant's attorney then read the following to the jury:

Mr. Webster is a dialysis patient at DCI Dialysis Unit in Shelby, North Carolina. He currently receives dialysis treatments three days per week for approximately four hours each treatment. The patient is considered permanently and totally disabled on the basis of his renal disease. As the result of his chronic renal failure, he is chronically debilitated, has intermittent weakness which is more pronounced after dialysis therapy. The intercurrent or acute illness would further weaken this patient further impairing his physical ability. He also has severe hypertension and receives anti-hypertensive medications which can also produce weakness. He has had hospitalizations within the past twelve months for uncontrolled hypertension and congestive heart failure. Following those hospitalizations a period of recuperation occurred as expected.

Jimmy Henry testified for defendant that he was sitting in defendant's yard at about 5 p.m. on 26 July, that defendant was in

another part of the yard, and that Jeffries came up the road from his mother's house and entered defendant's yard. Defendant said "don't come in [my] yard, to get out of [my] yard." Henry testified that there was more talking, Jeffries was moving, and "the next thing I knew someone going in the trailer and boom, a shot."

Defendant testified that he has had heart disease since 1971, kidney failure since 1980, and that he was taking four hours of kidney dialysis treatment three days a week for kidney failure. He had been in Cleveland Memorial Hospital in Shelby for a week in late July 1987, and was still weak and sick and feeling bad on 26 July after he got home. He spent his time taking medicine and lying down after he got home. Several people, including Jeffries, were visiting defendant inside his trailer at about 11 a.m. on 26 July. At some point he told Jeffries to leave. Jeffries then jumped up and started coming toward him. His cousin grabbed Jeffries and took him outside the mobile home but Jeffries still would not leave. Defendant stayed inside, and someone finally took Jeffries away. Later in the day, Jeffries' mother asked defendant what was wrong. Defendant told her that he did not want Jeffries back in his yard and Mrs. Jeffries said that she would keep her son away. Still later in the day, defendant observed Jeffries in the yard. Defendant testified, "I put my speaker inside the door and closed the door halfway and I went in and sat down on the sofa." Defendant further testified:

> He steps [sic] upon the first step of my trailer. I could see him clearly. I begged him not to come in and he kicked my speaker over. I went into the kitchen where I keep my gun between the table and the refrigerator and I grabbed my gun and shot him. I was afraid in my condition. I could not fight him and that was the only thing I could do.

Following appropriate instructions, the jury was permitted to consider possible verdicts of guilty of first degree murder, guilty of second degree murder, guilty of voluntary manslaughter, or not guilty. The jury returned a verdict of guilty of first degree murder.

The issue dispositive of this appeal is whether the trial court erred when it excluded evidence that was relevant to defendant's belief that his life was threatened in relation to his plea of self-defense. The issue arose when the trial court sustained the dis-

trict attorney's objection to the following question directed to defendant by his attorney on direct examination:

COUNSEL: State whether or not you felt your life was threatened?

DISTRICT ATTORNEY: Objection.

THE COURT: Sustained.

In the instant case the trial judge instructed the jury, in pertinent part, as follows:

The defendant would be excused of first and second degree murder on the grounds of self-defense if:

First, it appeared to the defendant and he believed it to be necessary to kill the victim in order to save himself from death or great bodily harm, and

Second, the circumstances, as they appeared to the defendant at the time, were sufficient to create such a belief in the mind of a person of ordinary firmness.

The trial court's instruction to the jury was in accord with the established law of this State in homicide cases.

Self-defense is a complete defense or "perfect" defense to homicide if it is established that at the time of the killing:

(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Hughes,* 82 N.C. App. 724, 726, 348 S.E. 2d 147, 149-50 (1986) (quoting *State v. Bush,* 307 N.C. 152, 158, 297 S.E. 2d 563, 568 (1982) ).

> On the other hand, if defendant believed it was necessary to kill the deceased in order to save [himself] from death or great bodily harm, and if defendant's belief was reasonable in that the circumstances as they appeared to [him] at the time were sufficient to create such a belief in the mind of a person of ordinary firmness, but defendant, although without murderous intent, was the aggressor in bringing on the difficulty, or defendant used excessive force, the defendant under those circumstances has only the *imperfect right of self-defense,* having lost the benefit of perfect self-defense, and is guilty at least of voluntary manslaughter (emphasis in original).

*State v. Mize,* 316 N.C. 48, 52, 340 S.E. 2d 439, 441 (1986).

However, if there is no evidence from which the jury reasonably could find that defendant in fact believed that it was necessary to kill his adversary to protect himself from death or great bodily harm, then the defendant is not entitled to have the jury instructed on self-defense. *State v. Boykin,* 310 N.C. 118, 122, 310 S.E. 2d 315, 318 (1984). In determining whether there was any evidence of self-defense presented, the evidence must be interpreted in the light most favorable to defendant. *State v. Gappins,* 320 N.C. 64, 71, 357 S.E. 2d 654, 659 (1987).

In *State v. Hughes,* 82 N.C. App. 724, 348 S.E. 2d 147, defendant testified that he was scared for his life because he thought the victim was going to do something to him. The Court of Appeals held that the trial court erred in refusing defendant's request that the jury be instructed concerning the law of self-defense. In *State v. Bush,* 307 N.C. 152, 297 S.E. 2d 563 (1982), this Court held that the defendant was not entitled to an instruction on self-defense where the evidence taken in the light most favorable to defendant tended to indicate that defendant had not formed a belief that it was necessary to kill the victim in order to save himself from death or great bodily harm. In *State v. Blankenship,* 320 N.C. 152, 357 S.E. 2d 357 (1987), this Court reversed the Court of Appeals and held that defendant was not entitled to a self-defense instruction because there was no evidence from

which the jury reasonably could find that defendant in fact believed that it was necessary to kill his adversary to protect himself from death or great bodily harm. In *State v. Gappins*, 320 N.C. 64, 357 S.E. 2d 654, defendant relied upon accident rather than self-defense. We held that the evidence, when viewed in the light most favorable to defendant, indicated that defendant was the aggressor, that the killing was an accident and that defendant had not formed either a belief that it was necessary to kill the victim or an intent to kill him in order to protect himself from death or great bodily harm. Thus, there was no error in refusing to give a self-defense instruction.

These cases show the importance of evidence tending to show that defendant killed the victim under a subjective belief that it was necessary to do so in order to protect himself from death or great bodily harm. Thus, failure to permit a defendant to answer a question as to whether he believed that his life was threatened goes to the heart of a defense of perfect or imperfect self-defense.

The trial court erroneously sustained the State's objection to the question about whether defendant felt that his life was threatened because that evidence was highly relevant to the crucial question of defendant's state of mind at the time of the shooting, his knowledge and belief of danger, and his knowledge and belief of the necessity for action in relation to his plea of self-defense. Whether defendant in fact believed that his life was threatened and that it was necessary to kill in order to save himself from death or great bodily harm was a crucial factor for the jury to weigh in determining whether defendant was guilty of murder in the first degree or of some lesser degree of homicide or was not guilty. "[A] jury should, as far as possible, be placed in defendant's situation and possess the same knowledge of danger and the same necessity for action, in order to decide if defendant acted under reasonable apprehension of danger to his person or his life." *State v. Spaulding*, 298 N.C. 149, 158, 257 S.E. 2d 391, 396 (1979) (quoting *State v. Johnson*, 270 N.C. 215, 219, 154 S.E. 2d 48, 52 (1967)).

In the instant case, defendant testified that he has suffered from a heart condition since 1971 and from kidney failure since 1980. He was receiving four hours of kidney dialysis treatment

three days a week for kidney failure. He stated that when the shooting occurred on 26 July he had just been released from the hospital after a week long stay. Defendant stated that on 26 July, "I was still sick and I was weak." There was also considerable evidence of a previous confrontation between defendant and the victim earlier in the day at defendant's home.

Under the circumstances, it was error not to permit defendant to testify as to whether he believed his life was threatened. The jury, and not the court, determines the reasonableness of defendant's belief under the circumstances as they appeared to him, *State v. Hughes*, 82 N.C. App. 724, 728, 348 S.E. 2d 147, 150, unless there is no evidence from which a jury could conclude defendant's belief is reasonable. *State v. Mize*, 316 N.C. 48, 53, 340 S.E. 2d 439, 442 (1986).

We hold that the error was prejudicial. The excluded testimony went to the heart of defendant's self-defense claim. In light of the circumstances of this case and the trial court's instructions on self-defense, the effect of sustaining the objection to the testimony prevented defendant from completing his side of the story. If defendant had been able to present the excluded testimony, he might have been able to convince the jury that he shot Jeffries while under a reasonable belief that it was necessary to do so in order to save himself from death or great bodily harm. Thus, there is a reasonable possibility that, had the error not been committed, a different result would have been reached at trial. N.C.G.S. § 15A-1443 (1988).

Our decision finds support in previous decisions of this Court and the Court of Appeals involving the exclusion of evidence offered by defendants in self-defense homicide cases. *See State v. Spaulding*, 298 N.C. 149, 159, 257 S.E. 2d 391, 397 (prejudicial error to exclude self-defense evidence that defendant knew the victim would be dangerous and evidence of pervasive fear of physical harm in defendant's environment); *State v. Miller*, 282 N.C. 633, 642, 194 S.E. 2d 353, 359 (1973) (prejudicial error to exclude self-defense evidence of defendant's apprehension that he was about to suffer death); *State v. Erby*, 56 N.C. App. 358, 360, 289 S.E. 2d 86, 88 (1982) (prejudicial error to exclude self-defense evidence about why defendant carried a loaded gun).

We find it unnecessary to discuss defendant's other assignments of error since they are not likely to recur at a new trial.

New trial.