IN THE SUPREME COURT OF NORTH CAROLINA

No. 290A18

Filed 14 June 2019

STATE OF NORTH CAROLINA

v.

ALPHONZO HARVEY

Appeal pursuant to N.C.G.S. § 7A-30(2) from the unpublished decision of a divided panel of the Court of Appeals, ___ N.C. App. ___, 817 S.E.2d 500 (2018), finding no error after appeal from a judgment entered on 24 May 2017 by Judge Milton F. Fitch, Jr. in Superior Court, Edgecombe County.  Heard in the Supreme Court on 4 March 2019.

> *Joshua H. Stein, Attorney General, by Thomas O. Lawton III, Assistant Attorney General, for the State.*
>
> *Jeffrey William Gillette for defendant-appellant.*

MORGAN, Justice.

Defendant Alphonzo[1] Harvey was charged upon a proper indictment and convicted by a jury of second-degree murder, a criminal offense in violation of N.C.G.S. § 14-17.  Defendant contended on appeal that the trial court committed error by failing to instruct the jury on the affirmative defense of self-defense pursuant to

---

[1] Defendant's first name is spelled "Alphonso" in the trial transcript.  For purposes of continuity and to avoid confusion, this opinion retains the spelling of defendant's name as shown in the Court of Appeals opinion and the record on appeal.

his request. The Court of Appeals disagreed and upheld defendant's conviction, finding that in light of the evidence, defendant was not entitled to a jury instruction on any theory of self-defense. We affirm the determination of the Court of Appeals.

**Factual and Procedural Background**

On 11 April 2016, defendant was indicted by a grand jury for the criminal offense of first-degree murder in connection with the stabbing death of Tobias Toler. Defendant pleaded not guilty and the State elected to refrain from proceeding capitally. A jury trial was held beginning on 22 May 2017 before the Honorable Milton F. Fitch, Jr. in Superior Court, Edgecombe County, during which the State presented evidence from ten witnesses and defendant testified on his own behalf.

The evidence presented at trial tended to show the following: On 11 August 2015, Toler and four of defendant's friends attended a party at defendant's mobile home. At the party, the attendees were drinking alcohol, listening to music, and dancing. At some point, Toler was dancing with a woman with whom defendant had previously engaged in a romantic or sexual relationship. Toler had been drinking a beer with a high alcohol content from a plastic bottle, and he began staggering "all over [the] house" and acting in a rowdy manner by "getting real loud and . . . cussing and fussing." Defendant, who had consumed at least one beer by this time, realized Toler was intoxicated and testified that he "asked him to leave about seven, eight times." Toler, however, refused to depart until defendant left the dwelling as well.

Defendant testified that, as he exited the trailer, Toler followed and stated that "he ought to whip [defendant's] damn ass." Toler threw the plastic beer bottle from which he had been drinking in defendant's direction, but the bottle did not make contact with defendant.

Defendant started to go back inside his mobile home but, upon realizing that Toler had not yet left the premises, turned back to confront Toler, asking, "[D]idn't I tell you [to] leave my damn house[?]" Defendant testified that, in response, Toler found "a piece of broke [sic] off little brick" and threw it at defendant, cutting defendant's finger. Toler then reached into his pocket and produced a small, black pocketknife, telling defendant that "he ought to kill [defendant's] damn ass with it."[2] Defendant once again ordered Toler to leave his property, at which point defendant testified that after Toler hit him, he "hit [Toler] in the face."

Defendant then went back inside his mobile home and grabbed a knife from the top of a cabinet.[3] Defendant testified that his purpose for returning to the trailer to obtain the knife was "[b]ecause I was scared [Toler] was going to try and hurt me," and that it was defendant's belief that once he got the knife, Toler would "leave, go ahead on and leave." When defendant returned outside, he approached Toler while

---

[2] Defendant referred to the pocketknife in his testimony as a "little bitty, black pocketknife about two fingers long."

[3] Witnesses testified that the knife resembled "an iron pipe with a blade on the end of it."

displaying the knife and swinging it in Toler's direction. When questioned at trial regarding his use of the knife, defendant testified that he "tried to make [Toler] leave." During the confrontation, Toler attempted to move defendant's motorized scooter which was resting against the side of the mobile home. In the process, the scooter fell to the ground, breaking its headlights.[4] Toler also slipped to the ground, but immediately returned to his feet. Defendant then approached Toler and "ma[d]e a stabbing motion about three times," piercing Toler once in the chest and puncturing his heart.

Following the stabbing, Toler attempted to run away but collapsed in a nearby resident's yard. When asked on direct examination about Toler's departure from defendant's mobile home property, defendant stated that "[a]fter the accident happened to him, he left, he ran out of the yard then." Defendant further testified that he believed that Toler "just got scared and ran," and he thought that Toler had collapsed because he was drunk. Defendant did not approach Toler after he left defendant's property; instead, defendant walked back inside the mobile home, pulled out a tissue, and cleaned Toler's blood from the blade of the knife. Defendant then placed the knife back on top of the cabinet from where defendant had initially

---

[4] Defendant did not request an instruction based on the "castle doctrine" as set forth in N.C.G.S. §§ 14-51.2(b) or 14-51.3(a)(1). Defendant's counsel, to the contrary, expressly stated to the trial court that such an instruction was not warranted under the circumstances of this case. Therefore, the applicability of the castle doctrine is not before us.

obtained it, walked outside, and proceeded to burn the bloody tissue that he had used to clean the knife.

Defendant had given notice of his intent to assert defenses that included self-defense, and during the charge conference he requested a self-defense instruction along with an instruction on voluntary manslaughter. The trial court declined to deliver both of these requested instructions and instructed the jury to consider only whether defendant was guilty of first-degree murder, the lesser-included offense of second-degree murder, or not guilty. Accordingly, no form of a self-defense instruction was given to the jury by the trial court. On 24 May 2017, the jury convicted defendant of second-degree murder for the stabbing of Toler. The trial court thereupon sentenced defendant to a term of 483 to 592 months of imprisonment.

Upon defendant's appeal, the Court of Appeals concluded that defendant was not entitled to a self-defense instruction because the evidence at trial did not establish that defendant believed that it was necessary to kill Toler in order to protect himself from death or great bodily harm. As a result, the Court of Appeals majority found no error in defendant's trial. The dissenting judge on the Court of Appeals panel expressed the opinion that the trial court should have delivered a self-defense instruction and that its failure to do so prejudiced defendant. We agree with the lower appellate court, as this Court finds the Court of Appeals' application of the

pertinent law to be sound and correct. Consequently, we shall weave some of its analysis into our own.

## Analysis

"The concept of self-defense emerged in the law as a recognition of a 'primary impulse' that is an 'inherent right' of all human beings." *State v. Moore*, 363 N.C. 793, 796, 688 S.E.2d 447, 449 (2010) (quoting *State v. Holland*, 193 N.C. 713, 718, 138 S.E. 8, 10 (1927)). The principles of the two types of self-defense—perfect and imperfect—"are well established." *State v. Reid*, 335 N.C. 647, 670, 440 S.E.2d 776, 789 (1994). A defendant is entitled to an instruction on perfect self-defense as an excuse for a killing when the evidence presented at trial tends to show that, at the time of the killing:

> (1)     it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and
>
> (2)     defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and
>
> (3)     defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and
>
> (4)     defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Bush*, 307 N.C. 152, 158-59, 297 S.E.2d 563, 568 (1982) (quoting *State v. Norris*, 303 N.C. 526, 530, 279 S.E.2d 570, 572-73 (1981) (italics omitted)), *habeas corpus granted sub nom. Bush v. Stephenson*, 669 F. Supp. 1322 (E.D.N.C. 1986), *aff'd per curiam*, 826 F.2d 1059 (4th Cir. 1987) (unpublished); *see also State v. Watson*, 338 N.C. 168, 179-80, 449 S.E.2d 694, 701 (1994) (quoting *State v. McAvoy*, 331 N.C. 583, 417 S.E.2d 489 (1992)), *cert. denied*, 514 U.S. 1071 (1995), *disavowed in part in State v. Richardson*, 341 N.C. 585, 461 S.E.2d 724 (1995). The doctrine of imperfect self-defense applies when the evidence supports a determination that only the first two elements in the preceding quotation existed at the time of the killing, in which case the defendant would be guilty of the lesser included offense of voluntary manslaughter. *State v. Locklear*, 349 N.C. 118, 154-55, 505 S.E.2d 277, 298 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). Therefore, for a defendant to establish entitlement to an instruction on perfect or imperfect self-defense,

> two questions must be answered in the affirmative: (1) Is there evidence that the defendant in fact formed a belief that it was necessary to kill his adversary in order to protect himself from death or great bodily harm, and (2) if so, was that belief reasonable? If both queries are answered in the affirmative, then an instruction on self-defense must be given. If, however, the evidence requires a negative response to either question, a self-defense instruction should not be given.

*Moore*, 363 N.C. at 796, 688 S.E.2d at 449 (quoting *Bush*, 307 N.C. at 160-61, 297 S.E.2d at 569). That is, when "there is no evidence from which a jury could reasonably find that defendant, in fact, believed it to be necessary to kill his adversary to protect

himself from death or great bodily harm, defendant is not entitled to have the jury instructed on self-defense." *Reid*, 335 N.C. at 671, 440 S.E.2d at 789 (citing *Bush*, 307 N.C. at 161, 297 S.E.2d at 569).

Defendant contends in the case sub judice that the trial court erred by refusing to instruct the jury on self-defense. Defendant argues that the evidence presented at trial—namely, Toler's (1) aggressiveness, (2) verbal and physical threats against defendant, and (3) attack on defendant with a brick fragment, a beer bottle, and a pocketknife—entitled defendant to instructions on perfect and imperfect self-defense because he possessed reasonable fear of death or great bodily harm such that a jury "could have found . . . that, at the time he administered the fatal wound with his knife, he believed it was necessary to kill or seriously injure Toler in order to save himself." This argument is unpersuasive.

The evidence, taken in the light most favorable to defendant, fails to manifest any circumstances existing at the time defendant stabbed Toler which would have justified an instruction on either perfect or imperfect self-defense. Despite his extensive testimony recounting the entire transaction of events from his own perspective, defendant never represented that Toler's actions in the moments preceding the killing had placed defendant in fear of death or great bodily harm such that defendant reasonably believed that it was necessary to fatally stab Toler in order to protect himself. On the other hand, defendant's own testimony undermines his

argument that any self-defense instruction was warranted because, as the Court of Appeals majority correctly noted in its opinion, this Court's previous determinations have clear and direct applicability to defendant's contentions so as to eliminate his eligibility for his requested jury charge language.

The lower appellate court cited: (1) our decision in *State v. Blankenship*, 320 N.C. 152, 155, 357 S.E.2d 357, 359 (1987), for the principle that "a defendant cannot benefit from a self-defense instruction where he claims that the killing was accidental", *Harvey*, ___ N.C. App. ___, 817 S.E.2d 500, 2018 WL 3734234, at *3 (2018) (unpublished); (2) our determination in *State v. Lyons*, 340 N.C. 646, 459 S.E.2d 770 (1995), for the premise that "defendant's self-serving statement that he was 'scared' is not evidence that defendant formed a belief that it was necessary to kill in order to save himself", *id.* at *4 (quoting *Lyons*, 340 N.C. at 662, 459 S.E.2d at 779); and (3) our declaration in *State v. Williams*, 342 N.C. 869, 873, 467 S.E.2d 392, 394 (1996), for the point that a self-defense instruction is not required where defendant fired his pistol in order to get the murder victim and others to retreat, *id.* at *3. After viewing this Court's rulings in these cases as controlling, the Court of Appeals majority vividly demonstrated defendant's lack of entitlement to a self-defense instruction by quoting from an extensive passage of defendant's testimony elicited on his direct examination during which defendant twice expressly referred to his act of stabbing Toler as "the accident," explicitly stated that his purpose in going back in the trailer and picking up that knife was "[b]ecause I was scared he [Toler] was going to try and hurt me,"

and definitively represented that what he sought to do with the knife was "to make him [Toler] leave." *Id.* at *4.

We agree with the Court of Appeals' view of defendant's testimony at trial regarding this issue:

> [Defendant's] testimony fails to satisfy the requirements for an instruction on self-defense because it does not establish that (1) Defendant was actually being attacked by Toler such that he actually feared great bodily harm or death as a result of Toler's actions; and (2) he inflicted the fatal blow to Toler in attempt to protect himself from such harm . . . Defendant never clearly testified that he feared he was in such danger as a result of Toler's actions with the pocketknife in the moments preceding the stabbing. Nor did he ever testify as to facts demonstrating that such a fear would have been reasonable—i.e., that Toler lunged at him with the pocketknife, that Toler made any stabbing motions with the pocketknife, or that the pocketknife was even pointed in Defendant's direction. . . .
>
> Defendant's testimony also fails to demonstrate that his fear of such harm caused him to inflict that fatal blow to Toler's chest. Indeed, Defendant's failure to expressly admit to stabbing Toler with his knife further undercuts his ability to argue that the stabbing was committed as an act of self-defense.

*Id.* at *6. Defendant's own depictions of his act of killing Toler as an accident, his decision to obtain the knife due to being motivated by fear, and his intention to use the knife in order to persuade Toler to leave defendant's residential premises all operate to clearly invoke the application of our holdings in *Blankenship*, *Lyons*, and *Williams* so as to establish that it was not appropriate for defendant in the present

case to receive the benefit of an instruction on self-defense.

In assessing defendant's contention that the trial court erred in failing to grant his request to instruct the jury on the affirmative defense of self-defense, and in evaluating the applicability of the principles of perfect and imperfect self-defense to the facts of the instant case in light of the relevant case law, we agree with the Court of Appeals' determination that the requirements for a jury instruction on self-defense do not exist in this case. Under *Bush*, defendant is not entitled to an instruction on perfect self-defense, and in light of *Locklear*, defendant is not eligible for an instruction on imperfect self-defense. Defendant has failed to satisfy the threshold requirements of *Moore* and *Reid*, both of which required defendant to present evidence that he formed a reasonable belief that it was necessary for him to fatally stab Toler in order for defendant to protect himself from death or great bodily harm, because there is no evidence from which a jury could reasonably make such a finding so as to entitle defendant to have the jury to be instructed on self-defense.

## Conclusion

We conclude that the trial court did not err in declining defendant's request to instruct the jury on either the affirmative defense of perfect self-defense or imperfect self-defense. Defendant received a fair trial, free from error. Accordingly, this Court affirms the decision of the Court of Appeals.

AFFIRMED.

Justice DAVIS did not participate in the consideration or decision of this case.

Justice EARLS dissenting.

Tobias Toler was thirty-six years old when he was stabbed in the heart on 11 August 2015 and died moments later in Sharpsburg, North Carolina. His blood alcohol content at the time of his death was 0.34 and a pocketknife was found on his person. Defendant Alphonzo Harvey admitted stabbing Mr. Toler, and the only question for the jury in this case was whether the killing was justified. I dissent because I believe the trial court and this Court are making the judgment call that should be made by the jury, the twelve men and women of Edgecombe County who heard the evidence and saw the witnesses testify at trial. In so doing, the Court ignores controlling precedent and applies inconsistent standards to weigh the evidence.

This Court recently reaffirmed long-standing doctrine that:

> "The jury charge is one of the most critical parts of a criminal trial." *State v. Walston*, 367 N.C. 721, 730, 766 S.E.2d 312, 318 (2014). "[W]here competent evidence of self-defense is presented at trial, the defendant is entitled to an instruction on this defense, as it is a substantial and essential feature of the case . . . ." *State v. Morgan*, 315 N.C. 626, 643, 340 S.E.2d 84, 95 (1986) (citations and emphasis omitted); *see State v. Guss*, 254 N.C. 349, 351, 118 S.E.2d 906, 907 (1961) (per curiam) ("The jury must not only consider the case in accordance with the State's theory but also in accordance with defendant's explanation.").

*State v. Lee*, 370 N.C. 671, 674, 811 S.E.2d 563, 565-66 (2018) (alterations in original).

To determine whether Mr. Harvey was entitled to an instruction on self-defense, the evidence must be viewed in the light most favorable to him. *State v. Moore*, 363 N.C. 793, 796, 688 S.E.2d 447, 449 (2010). "An affirmative defense is one in which the defendant says, 'I did the act charged in the indictment, but I should not be found guilty of the crime charged because * * * .'" *State v. Caddell*, 287 N.C. 266, 289, 215 S.E.2d 348, 363 (1975) (citations omitted). Defendant here admitted to killing the victim; the trial judge was required to consider the evidence in the light most favorable to defendant and to ignore any inconsistent evidence in deciding whether to submit the requested self-defense or imperfect self-defense instructions. It was then the jury's job to determine defendant's guilt or innocence. By refusing to instruct the jury on self-defense when evidence supporting the instruction was present, the judge usurped the role of the jury and all but guaranteed a guilty verdict.

Rather than consider the evidence in the light most favorable to defendant, the Court here imposes a "magic words" requirement in favor of the State. In essence, the majority holds that by failing to testify using the magic words, "I was in fear of my life and believed I needed to kill Toby to save myself from death or great bodily harm," the defendant has failed to allege self-defense and, equally damning, by using the magic word "accident" in passing during his testimony to refer to the incident, defendant has foreclosed any consideration by the jury of whether he acted in self-defense. Our case law imposes no such magic word requirement or trap for defendants. Instead, the trial court must consider the defendant's evidence as true,

including other testimony and evidence received at trial which tends to support it, and disregard any contradictory evidence when determining whether the jury should be instructed on self-defense. *Moore*, 363 N.C. at 796-98, 688 S.E.2d at 449-50.

The majority recounts some of defendant's evidence concerning self-defense and then finds it "unpersuasive." The question for the Court is not whether the evidence is persuasive, but whether it establishes the elements of self-defense or imperfect self-defense. With regard to the first two elements of self-defense, whether it appeared to defendant that it was necessary to kill Toler in order to protect himself from death or great bodily harm and whether that belief was reasonable, the evidence is as follows: Alphonzo Harvey repeatedly asked Toby Toler to leave his house after Toler had been drinking, was argumentative, and used foul language in front of Harvey and his female guests. Toler was "staggering all over my [Harvey's] house" and Harvey asked him seven or eight times to leave. Toler refused to do so.

Finally, Harvey walked out and Toler followed him. Toler then "said he ought to whip my [Harvey's] damn ass." Other witnesses described how Toler said to Harvey, "I will fuck you up." Toler threw a bottle of beer at Harvey.[1] Toler also threw a brick at Harvey, which Harvey testified hit his finger when he raised his hand. Witnesses said the brick hit the wall of Harvey's house with a loud thud. Toler hit

---

[1] The majority describes this as a plastic beer bottle, but only one witness of several who testified to this actually said that it was plastic; other testimony indicated the bottle was glass.

Harvey; Harvey hit him back, and Toler knocked over Harvey's scooter, breaking the headlights.

Toler then pulled out a pocketknife and threatened Harvey with it: according to Harvey, "He told me he ought to kill my damn ass with it." Harvey testified that at this point, "I thought he was going to try and hurt me so." When asked why, Harvey responded, "Because he had a pocketknife." Harvey testified that he then went back into his trailer and got a knife that was mounted on the end of a wooden rod "because I was scared he [Toler] was going to try and hurt me." Harvey explained that he was just holding his knife in his hand:

> Q.    Were you just holding it or were you –
> A.    I didn't do nothing. Just holding it in my hand. I didn't do nothing.
> Q.    At any point did you go and use your knife to physically remove him?
> A.    No, he came up on me, coming up on me. He was walking up on me with his knife. That's when I had my knife.
> . . . .
> Q.    And at what point did you hit him with your knife?
> A.    I didn't, I just hit – he –
> THE COURT:  Did what?
> . . . .
> A.    I said hit him right there.
> Q.    After you hit him right there with it, what did he do?
> A.    He ran to the road.

Later Harvey explained that, after returning the knife to his trailer, he left the scene because "I was scared somebody might come up and try to hurt me." Taken in the

light most favorable to the State, Harvey left the scene and went to a neighbor's house because he knew he had done something wrong. Taken in the light most favorable to defendant, Harvey left because he truly was afraid of Toler, and his contemporaneous action confirms that his testimony that he was scared is not simply a self-serving fabrication after the fact.

Harvey further testified that he was scared and uncertain as to what Toler would do to him, partly because he knew Toler to carry a knife at all times. "[E]vidence of prior violent acts by the victim or of the victim's reputation for violence may, under certain circumstances, be admissible to prove that a defendant had a reasonable apprehension of fear of the victim." *State v. Strickland*, 346 N.C. 443, 459, 488 S.E.2d 194, 203 (1997) (citation omitted), *cert denied*, 522 U.S. 1078 (1998); *see also State v. Irabor*, ___ N.C. App. ___, ___, 822 S.E.2d 421, 424 (2018) ("Defendant's knowledge of [the victim]'s violent propensities, *being armed*, and prior acts supports the trial court's finding that defendant reasonably believed it was necessary to use deadly force to save himself from death or great bodily harm." (emphasis added)). Based on defendant's testimony and all the circumstances, the evidence was "sufficient that defendant ha[d] a reasonable apprehension that an assault on him with deadly force [wa]s imminent." *State v. Spaulding*, 298 N.C. 149, 157, 257 S.E.2d 391, 396 (1979) (citations omitted).

On some key points, the majority ignores Harvey's testimony and credits contradictory testimony. For example, on the question of whether Toler was

approaching Harvey with his knife in his hand when Harvey stabbed him, or whether Harvey approached Toler, the majority assumes the facts most favorable to the State. Despite Harvey's repeated testimony that he was scared of Toler, was afraid he would be hurt, and was being threatened with a knife by Toler, who was drunk and had just said he ought to kill him, the majority finds that the evidence "fails to manifest any circumstances existing at the time defendant stabbed Toler which would have justified an instruction on either perfect or imperfect self-defense." This is contrary to our precedents presenting very similar facts in which this Court has held that a self-defense or imperfect self-defense instruction is required.

For example, in *Spaulding* the defendant stabbed and killed another inmate who was advancing on him with his hand in his pocket, and this Court found it was error to refuse to instruct the jury on self-defense. 298 N.C. at 156-57, 257 S.E.2d at 396. In that case the reasonableness of the defendant's belief that he was in imminent danger of great bodily harm or death "was a question for the jury." *Id.* at 157, 257 S.E.2d at 396. Similarly, in *State v. Webster* the defendant shot and killed an unarmed man who previously had been in the defendant's trailer, was asked to leave, and had left. 324 N.C. 385, 389, 378 S.E.2d 748, 751 (1989). Sometime later, the victim returned and was standing on the steps of the trailer when the defendant shot him. *Id.* at 389, 378 S.E.2d at 751. The defendant testified: "I was afraid in my condition. I could not fight him and that was the only thing I could do." *Id.* at 389, 378 S.E.2d at 751. That was sufficient evidence to submit a self-defense instruction

to the jury, and the trial court's refusal to allow the defendant in that case to state whether he believed his life was threatened was reversible error. *Id.* at 393, 378 S.E.2d at 753. In relevant portions, the facts in *Spaulding* and *Webster* are similar to the facts in this case, and defendant here is entitled to a self-defense instruction, as were those defendants.

Even more relevant is *State v. Buck*, in which the Court instructed that "we reiterate that it is important for the trial court to include the possible verdict of not guilty by reason of self-defense in its final mandate to the jury." 310 N.C. 602, 607, 313 S.E.2d 550, 553 (1984). There the defendant's account of the incident was that the victim had an open pocketknife in his hand and came into the kitchen where the defendant was standing. *Id.* at 603, 313 S.E.2d at 551. The victim acted abusively and threatened to kill a third person. *Id.* at 603, 313 S.E.2d at 551. When the victim went towards the defendant while brandishing the open pocketknife, the defendant, hoping to scare the victim, grabbed a butcher knife and the two men struggled and fell to the floor, causing the butcher knife to lodge in the victim's chest. *Id.* at 603, 313 S.E.2d at 551. The defendant pulled the butcher knife out and tossed it aside, and the two kept fighting for a period of time until the victim dropped the pocketknife, got up, and walked out of the apartment. *Id.* at 603-04, 313 S.E.2d at 551-52. The victim died later that day. *Id.* at 604, 313 S.E.2d at 552. In that case the Court had no difficulty observing that, based on the defendant's evidence, "[i]f, however, the jury should conclude that he intentionally wielded the knife, then it should acquit him on

the grounds of self-defense." *Id.* at 606, 313 S.E.2d at 553. There is nothing about the material facts of *Buck* to distinguish it from this case.

Part of the majority's concern here appears to be that Harvey did not say, "*I was afraid for my life and believed I had to kill my attacker*." But, as the transcript reveals, defendant was inarticulate. Defendant testified he only completed the ninth or tenth grade. In addition to his limited education, defendant had sustained a severe head injury in a car accident in 2008, which required insertion of a metal plate in his head. As a result of the head injury, defendant was permanently disabled and suffered memory loss. The injury also affected defendant's ability to talk and function. Inarticulate and less well coached defendants should be treated equally with those who can easily learn the "magic words" the majority would require for a self-defense instruction. The question is whether there is evidence of self-defense or imperfect self-defense, when taken in the light most favorable to defendant. *See State v. Dooley*, 285 N.C. 158, 163, 203 S.E.2d 815, 818 (1974) ("Where there is evidence that defendant acted in self-defense, the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in defendant's evidence." (citations omitted))

The cases cited by the majority for the proposition that when the defendant claims the killing is accidental, or that a weapon was used solely to get the victim and others to retreat, do not apply here because Harvey clearly stated that he feared Toler was trying to hurt him and that he used his knife when Toler "came up on" him with

a pocketknife.  Specifically, *State v. Williams*, 342 N.C. 869, 467 S.E.2d 392 (1996), involved a defendant who testified that he fired his weapon in the air to scare those who made him feel threatened and did not shoot at anyone; *State v. Lyons*, 340 N.C. 646, 459 S.E.2d 770 (1995), involved a defendant who testified that he fired a warning shot at the top of his door because he believed he was being robbed and that he was not trying to hit anyone; and *State v. Blankenship*, 320 N.C. 152, 357 S.E.2d 357 (1987), involved a defendant who testified that during a physical fight, he pulled out his gun to hit the victim on the head with it, after which the victim grabbed the gun by the barrel and it fired accidently.  Each of these circumstances is very different from Mr. Harvey's situation, in which he testified that while he was standing on the steps of his trailer, Toler came at him with a knife and he stabbed Toler in the chest.  Harvey acknowledged in his testimony that he struck the blow intentionally.  The context of his later statement regarding Toler's "accident" shows that he was using the same word to refer to the incident that a previous witness had used.  Annie May Alston, testifying before Harvey, stated: "Not on that particular day that the accident happened, no."  Harvey then testified: "After the accident happened to him, he left." His use of the word "accident" does not directly refer to his own actions and does not negate all his other testimony regarding his fears about how Toler intended to harm him.  To imply otherwise is to elevate form over substance in a manner that is unjustified by the evidence in this case.

Second-degree murder does not require that the accused acted with the intent to kill, and therefore, Harvey did not need to testify that he intended to kill Toler, only that he intended to strike the blow, as this Court explained in *State v. Richardson*, 341 N.C. 585, 461 S.E.2d 724 (1995). *See State v. Carter*, 357 N.C. 345, 361, 584 S.E.2d 792, 803-04 (2003) (reaffirming *Richardson*), *cert denied*, 541 U.S. 943 (2004); *see also Lee*, 370 N.C. at 673, 811 S.E.2d at 565 (self-defense available as a defense to second-degree murder). Moreover, Toler already had threatened to kill Harvey, had hit him, and he had thrown both a bottle and a brick at him. Harvey did not need to wait for Toler to actually stab him with the pocketknife before defending himself.

Harvey may have used excessive force to repel Toler's attack, in which case the jury should have had the option of finding that Harvey acted in imperfect self-defense. *See State v. Bush*, 307 N.C. 152, 159, 297 S.E.2d 563, 568 (1982) (imperfect self-defense exists when the defendant believed it necessary to kill his adversary in order to save himself and when that belief was reasonable, but the defendant was either the aggressor or used excessive force), *habeas corpus granted sub nom. Bush v. Stephenson*, 669 F. Supp. 1322 (E.D.N.C. 1986), *aff'd per curiam*, 826 F.2d 1059 (4th Cir. 1987) (unpublished). But the jury did not have that opportunity here because the trial court erroneously failed to give a self-defense instruction. The jury, not the trial judge or this Court, has the responsibility to weigh the evidence and determine

whether Alphonzo Harvey acted in self-defense, either perfectly or imperfectly, when he stabbed Tobias Toler.  Accordingly, I would remand for a new trial.